**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YAKUB, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 09-1152 (RBW) |
| ) | Civil Action No. 09-1228 (RBW) |
| WASHINGTON METROPOLITAN ) | Civil Action No. 09-1231 (RBW) |
| AREA TRANSIT AUTHORITY ) | Civil Action No. 09-1374 (RBW) |
| ) | Civil Action No. 09-1442 (RBW) |
| Defendant. ) | Civil Action No. 09-1488 (RBW) |
| ) | Civil Action No. 09-1514 (RBW) |
| | Civil Action No. 09-1609 (RBW) |
| | Civil Action No. 09-1706 (RBW) |
| JENKINS, *et al.* ) | Civil Action No. 09-1721 (RBW) |
| ) | Civil Action No. 09-1762 (RBW) |
| Plaintiffs, ) | Civil Action No. 09-1774 (RBW) |
| ) | Civil Action No. 09-1834 (RBW) |
| v. ) | Civil Action No. 09-1993 (RBW) |
| ) | Civil Action No. 09-2061 (RBW) |
| WASHINGTON METROPOLITAN ) | Civil Action No. 09-2062 (RBW) |
| AREA TRANSIT AUTHORITY ) | Civil Action No. 09-2171 (RBW) |
| ) | |
| and ) | |
| ) | |
| ALSTOM SIGNALING, INC. ) | |
| ) | |
| Defendants. ) | |
| | |
| AMARI DANIELLE WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| WASHINGTON METROPOLITAN ) | |
| AREA TRANSIT AUTHORITY ) | |
| ) | |

|                                    |   |
|------------------------------------|---|
| **and**                            | ) |
|                                    | ) |
| **ALSTOM SIGNALING, INC.**         | ) |
|                                    | ) |
| **and**                            | ) |
|                                    | ) |
| **ANSALDO STS USA, INC.**          | ) |
|                                    | ) |
| **Defendants.**[1]                 | ) |
|                                    | ) |

## MASTER COMPLAINT

## JURISDICTION AND VENUE

1.      Jurisdiction in this Court is founded on the Washington Metropolitan Area Transit Regional Compact, which establishes original jurisdiction in this Court over WMATA matters pursuant to WMATRC Art XVI § 81; D.C. Code Ann. § 1-2431(81) (1981) and DC ST § 9-1107.10.

2.      Venue in this Court is proper as the negligent acts and/or omissions, committed by the Defendants occurred in the District of Columbia.

## DEFENDANTS

3.      At all times relevant, Defendant Washington Metropolitan Area Transit Authority (hereinafter "WMATA") was the owner of the Metro subway system being operated by its employees, who were acting within the course and scope of their employment and/or agency with WMATA.

---

[1] As of the date of filing this Master Complaint, the Court has not yet established a master docket, although it is anticipated one will be established in the near future.

4.     Defendant WMATA was created when Congress approved the Washington Metropolitan Area Transit Authority Compact ("WMATA Compact"), D.C. Code Sec. 9-1107.01 *et seq*., that was signed by the District of Columbia, Maryland and Virginia.

5.     By the terms of the WMATA Compact creating it, WMATA is liable for its negligent acts and/or omissions and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function "D.C. Code Sec. 9-1107.01(80).

6.     The provision of mass transportation is a proprietary function within the meaning of the WMATA Compact.

7.     Upon information and belief, Defendant Alstom Signaling, Inc. ("Alstom") is a Delaware Corporation with its principal place of business in New York, who provides train traffic control equipment, software and support services to Defendant WMATA.

8.     Upon information and belief, at all relevant times herein, Defendant Alstom Signaling Inc. provided train traffic control equipment, software and support services to WMATA.

9.     Upon further information and belief, prior to June 22, 2009, Defendant Alstom Signaling Inc. was involved in the design, manufacture, marketing, inspection, distribution, sale and/or warranty to the public, including the WMATA subway system

and the passengers using that subway system, and placed into the stream of commerce, the automatic train control system, or component parts thereof, for the WMATA system.

10.   Upon information and belief, Defendant Ansaldo STS USA, Inc. (formerly d/b/a Union Switch & Signal, Inc., hereinafter "Ansaldo"), is a Delaware Corporation with its principal place of business in Pittsburgh, PA.  During the time period relevant to this Complaint, Ansaldo engaged in transactions in the District of Columbia from which the claims herein arise.

11.   Upon information and belief, at all relevant times herein, Defendant Ansaldo provided train traffic control equipment, software and support services to WMATA.

12.   Upon further information and belief, prior to June 22, 2009, Defendant Ansaldo was involved in the design, manufacture, marketing, inspection, distribution, sale and/or warranty to the public, including the WMATA subway system and the passengers using that subway system, and placed into the stream of commerce, the automatic train control system, or component parts thereof, for the WMATA system.

13.   Defendant ARINC is a Delaware Corporation with its principal place of business in Maryland.  During the time period relevant to this Complaint, it engaged in transactions in the District of Columbia from which the claims herein arise.

14.   Upon information and belief, at all relevant times herein, Defendant ARINC provided train traffic control equipment, including a safety warning system

designed to detect the presence of other trains on the track, software and other support services to Defendant WMATA.

15.    Upon further information and belief, prior to June 22, 2009, Defendant ARINC was involved in the design, manufacture, marketing, inspection, distribution, sale and/or warranty to the public, including the WMATA subway system and the passengers using that subway system, and placed into the stream of commerce, the automatic train control system and/or warning system, or component parts thereof, for the WMATA system.

## PLAINTIFFS IN CIVIL ACTION NO. 09-1152

16.    Civil Action No. 09-1152 was originally styled Imhotep Yakub and Dawn Flanagan as parents and next friends of D.F., a Minor v. Washington Metropolitan Area Transit Authority.  Plaintiffs hereby include all the defendants listed above in this action and assert claims against them in accordance with this Master Complaint.

17.    D.F. is a minor (Date of Birth: 1993) residing with his parents, Imhotep Yakub & Dawn Flanagan at 2924 Southern Avenue S.E., Apartment #1, Washington, D.C. 20020.

18.    On June 22, 2009 at approximately 4:55 pm, Minor Plaintiff D.F. boarded a Washington Metropolitan Area Transit Authority (hereinafter "WMATA") Metro train at the Takoma Park station on the "Red Line," heading southbound. Minor Plaintiff D.F. alighted into the first car on that particular train.

19.     Following the aforesaid collision, emergency personnel arrived at the scene and removed Minor Plaintiff D.F. from the Metro train car and transported him to Washington Hospital Center, where he underwent surgery and other procedures to stabilize his condition.. Following his discharge from the hospital, D.F. received post-surgical care from the surgeon to whom the Hospital assigned to his care (John. L .Cohen, M.D.) , physical therapy and rehabilitation treatments. He has suffered and will continue to suffer pain, discomfort, and functional impairments and other diminutions in the quality of his life, including but not limited to, restrictions on his daily activities.  It is unknown at this time whether his condition will be permanent, or whether he will continue to require medical care, but the Plaintiffs, as his parents, reserve the right to so contend on his behalf and accordingly, demand compensatory damages for same against all Defendants, jointly and severally.

20.     As a proximate result of the aforesaid injuries, the Plaintiffs have incurred medical charges on behalf of their minor son D.F., have been required to take time off from work in order to care for him, and have otherwise been inconvenienced to attend to his care. They also remain responsible for any medical costs D.F. will require in the future until he reaches the age of majority.   Plaintiffs demand compensation for all such projected costs, past and future, proximately caused by the aforesaid occurrence which were and which  will be reasonably and  necessarily incurred  in the future and demand compensatory damages  for same from all of the Defendants, jointly and severally.

## PLAINTIFFS IN CIVIL ACTION NO. 09-1228

21.     Civil Action No. 09-1228, is styled David Holland v. WMATA, which was filed on or about July 9, 2009.

22.     On June 22, 2009, Plaintiff David Holland was a passenger on the second car of Defendant WMATA's subway train traveling on the Red Line, which violently struck another stopped Defendant WMATA subway train in the rear.

23.     At 4:58 p.m. Plaintiff David Holland was riding on the subway car when suddenly his body was violently thrown to the left about the subway train as a result of the June 22, 2009 crash.

24.     The first car of the striking subway train appeared to disappear, losing its floor and ceiling.

25.     Outside of the train there were severely injured passengers bleeding and moaning with exposed bone and open gashes and other serious wounds on the ground and on a fence.

26.     Inside Plaintiff David Holland's subway train there was injury, smoke and destruction surrounding him; he feared for his life, trapped inside the train, and for the lives of others.

27.     Eventually, Plaintiff David Holland was freed from his subway train and despite his own injuries he felt compelled to comfort other injured passengers on the ground until help arrived.

28.     As a direct and proximate result of conduct of the Defendants as alleged in this Complaint, Plaintiff David Holland suffered bodily injuries, which have caused, and will continue to cause, physical and emotional pain and suffering for the rest of his life. Plaintiff David Holland has incurred, and will continue to incur, medical, therapeutic, and related expenses.  Plaintiff David Holland sustained additional damages including loss of earnings from employment and inability to enjoy the normal functions of life. Plaintiff David Holland also has a profound fear of riding on the metro trains which prevents him from utilizing that mode of transportation.

29.     The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Plaintiff David Holland.

## PLAINTIFFS IN CIVIL ACTION NO. 09-1231

30.     Civil Action No. 09-1231, is styled <u>Jason Zimmerman v. WMATA</u>, which was filed on or about July 2, 2009.

31.     On June 22, 2009, Plaintiff Jason Zimmerman was a passenger on the second car of Defendant WMATA's subway train traveling on the Red Line, which violently struck another stopped Defendant WMATA subway train in the rear.

32.     At 4:58 p.m. Plaintiff Jason Zimmerman was riding on the subway car when suddenly his body was violently thrown to the left about the subway train as a result of the June 22, 2009 crash.

33.     The first car of the striking subway train appeared to disappear, losing its floor and ceiling.

34.     Outside of the train there were severely injured passengers bleeding and moaning with exposed bone and open gashes and other serious wounds on the ground and on a fence.

35.     Inside Plaintiff Jason Zimmerman's subway train there was injury, smoke and destruction surrounding him; he feared for his life, trapped inside the train, and for the lives of others.

36.     Eventually, Plaintiff Jason Zimmerman was freed from his subway train and despite his own injuries he felt compelled to comfort other injured passengers on the ground until help arrived.

37.     As a direct and proximate result of conduct of the Defendants as alleged in this Complaint, Plaintiff Jason Zimmerman suffered bodily injuries, which have caused, and will continue to cause, physical and emotional pain and suffering for the rest of his life.  Plaintiff Jason Zimmerman has incurred, and will continue to incur, medical, therapeutic, and related expenses.  Plaintiff Jason Zimmerman sustained additional damages including loss of earnings from employment and inability to enjoy the normal functions of life.  Plaintiff Jason Zimmerman also has a profound fear of riding on the metro trains which prevents him from utilizing that mode of transportation.

38.    The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Plaintiff Jason Zimmerman.

### PLAINTIFFS IN CIVIL ACTION NO. 09-1374

39.    Civil Action No. 09-1374, is styled Annette Williams-Lea v. WMATA, which was filed on or about June 29, 2009.

40.    On June 22, 2009, Plaintiff Williams-Lea was a passenger on the second car of Defendant WMATA's subway train traveling on the Red Line, which violently struck another stopped Defendant WMATA subway train in the rear.

41.    At 4:58 p.m. Plaintiff Williams-Lea was talking on her cell phone when suddenly her body was violently thrown to the left about the subway train as a result of the June 22, 2009 crash.

42.    The first car of the striking subway train appeared to disappear, losing its floor and ceiling.

43.    Outside of the train there were severely injured passengers bleeding and moaning with exposed bone and open gashes and other serious wounds on the ground and on a fence.

44.    Inside Plaintiff Williams-Lea's subway train there was injury, smoke and destruction surrounding her; she feared for her life, trapped inside the train, and for the lives of others.

45.    Eventually, Plaintiff Williams-Lea was freed from her subway train and despite her own injuries she felt compelled to comfort other injured passengers on the ground until help arrived.

46.    As a direct and proximate result of conduct of the Defendants as alleged in this Complaint, Plaintiff Williams-Lea suffered bodily injuries, which have caused, and will continue to cause, physical and emotional pain and suffering for the rest of her life. Plaintiff Williams-Lea has incurred, and will continue to incur, medical, therapeutic, and related expenses.  Plaintiff Williams-Lea sustained additional damages including loss of earnings from employment and inability to enjoy the normal functions of life

47.    The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Plaintiff Williams-Lea.

**PLAINTIFFS IN CIVIL ACTION NO. 09-1442**

48.    The Plaintiff in Civil Action No. 09-1442 is Carolyn B. Jenkins, Individually and as Personal Representative of the Estate of Veronica DuBose, deceased, which was filed on July 31, 2009.

49.    Plaintiff Carolyn B. Jenkins is the mother of Veronica DuBose, and has been appointed Personal Representative of the Estate of her daughter.  Veronica DuBose was a resident of the District of Columbia, was a certified nursing assistant, and was studying to become a registered nurse.

50.     On June 22, 2009, at approximately 5:02 p.m., Veronica DuBose, age 29, was a passenger for hire and was riding on Car 1079, the first car of WMATA Train 112 which collided with Train 214 causing Veronica DuBose to sustain severe, multiple and lethal injuries leading to her death, as well as to experience severe pain and suffering and emotional distress, both prior to and after impact of the colliding trains.

51.     Plaintiff Carolyn B. Jenkins is the mother of the decedent, Veronica Dubose. Plaintiff Carolyn B Jenkins has been duly appointed as Personal Representative of Veronica Dubose's estate by the Probate Division of the Superior Court of the District of Columbia on July 31, 2009, (Administrative No.000682).

52.     The decedent's right of action for injuries prior to her death caused by the negligent conduct of the Defendants survives in favor of Carolyn B. Jenkins, as the duly appointed Personal Representative of the Estate of Veronica DuBose.  As a direct and proximate result of the negligence of the defendants as described above Veronica DuBose sustained severe, multiple and lethal injuries leading to her death, as well as experienced severe pain and suffering and emotional distress, both prior to and after impact of the colliding trains.

53.     Plaintiffs in Civil Action No. 09-1442 are pursuing all claims for damages under the Wrongful Death and Survival Statutes.  The Plaintiff is survived by the following wrongful death beneficiaries: her children, A.S.K.D., 21 months old, and R.O.L.W., 8 years old; her mother, Carolyn B. Jenkins, who lived with and was financially and otherwise dependent on the decedent; and her father, Erwin DuBose.

**PLAINTIFFS IN CIVIL ACTION NO. 09-1488**

54.     Civil Action No. 09-1488, is styled <u>Bernea Lajuan Bell v. WMATA</u>, which was filed on or about June 29, 2009 in the Superior Court for the District of Columbia and removed to this Court on August 7, 2009.

55.     On June 22, 2009, Plaintiff Bernea Bell was a passenger in Defendant WMATA's subway train traveling on the Red Line, which violently struck another stopped Defendant WMATA subway train in the rear.

56.     As a direct and proximate result of conduct of the Defendants as alleged in this Complaint, Plaintiff Bernea Bell suffered bodily injuries, which have caused, and will continue to cause, physical and emotional pain and suffering for the rest of her life. Plaintiff Bernea Bell has incurred, and will continue to incur, medical, therapeutic, and related expenses.  Plaintiff Bernea Bell sustained additional damages including loss of earnings from employment and inability to enjoy the normal functions of life.

57.     The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Plaintiff Bernea Bell.

**PLAINTIFFS IN CIVIL ACTION NO. 09-1514**

58.     Plaintiff in Civil Action No. 09-1514, <u>Oscar O. Flores, Individually and on behalf of the Estate of Ana Graciela Argentina Fernandez Bautista, dec'd, and on behalf of J.S.F., a minor child of Ana Graciela Argentina Fernandez Bautista, dec'd v. Washington Metropolitan Area Transit Authority</u> filed on August 10, 2009 is the

surviving spouse of Ana Graciela Argentina Fernandez Bautista, dec'd and the biological father of J.S.F., a minor child.

59.     Ana Graciela Argentina Fernandez Bautista was killed as a result of the conduct of the Defendants as alleged in this Complaint.

60.     Plaintiff Oscar O. Flores is the surviving spouse of Ana Graciela Argentina Fernandez Bautista, dec'd, the biological father of J.S.F., a minor child, and a statutory beneficiary/rightful heir to the Estate of Ana Graciela Argentina Fernandez Bautista, dec'd.; J.S.F., a minor child, is a statutory beneficiary/rightful heir to the Estate of Ana Graciela Argentina Fernandez Bautista, dec'd.

61.     Plaintiff J.S.F., a minor, is the biological child of Oscar Flores and Ana Graciela Argentina Fernandez Bautista, dec'd.

62.     Plaintiff Oscar O. Flores has filed a Complaint for Custody of the minor Child and Other Relief in the Circuit Court for Montgomery County, Maryland in Case No. 82155, which is currently pending.

63.     Plaintiff Oscar O. Flores has filed a Motion to Dismiss, Terminate Guardianship Proceeding and/or Objection to the Relief Requested in Petitioner's Second Amended Emergency Petition for Appointment of Temporary and Permanent Co-Guardians over the Person and Property of J.S.F. in the Circuit Court for Montgomery County, Maryland in Case No. 80642-FL, which is currently pending.

64.    Attorney William Foote has been appointed by the Circuit Court of Montgomery County Maryland as the Temporary Guardian of the Property of the minor J.S.F., among others.

65.    Plaintiff Oscar O. Flores has filed a Notice of Appearance of Interested Person in the Prince George County case (Estate No. 82516), which is currently pending.

66.    Upon information and belief, the June 22, 2009 subway train crash caused Decedent Ana Graciela Argentina Fernandez Bautista's next of kin/statutory beneficiaries/rightful heirs to suffer damages and they seek recovery of all damages permitted under the District of Columbia Wrongful Death Act.  Decedent Ana Graciela Argentina Fernandez Bautista's causes of action in negligence survive her death and may be pursued by her Estate. Decedent Ana Graciela Argentina Fernandez Bautista's Estate seeks recovery for all damages permitted under the District of Columbia Survival Act.

67.    The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Decedent Ana Graciela Argentina Fernandez Bautista.

**PLAINTIFFS IN CIVIL ACTION NO. 09-1609**

68.    Plaintiffs in Civil Action No. 09-1609, Janice Williams and Isaiah Williams, Individually, on behalf of next of kin, and as Co-Personal Representatives of the Estate of Cameron Taihi Williams, Deceased v. WMATA, et al., are the Personal Representatives of Cameron Taihi Williams.

- 15 -

69.   Cameron Taihi Williams was killed as a result of the conduct of the Defendants as alleged in this Complaint.

70.   Plaintiff Janice Williams is the mother of Cameron Taihi Williams, deceased. Plaintiff Isaiah Williams is the brother of Cameron Taihi Williams, deceased. They are Co-Personal Representatives of the Estate of Cameron Taihi Williams, having been duly appointed by the Probate Division of the Superior Court of the District of Columbia on July 13, 2009.   The Plaintiffs reside at 424 Delafield Place, NW, Washington, DC 20011.

## PLAINTIFFS IN CIVIL ACTION NO. 09-1706

71.   Plaintiffs in Civil Action No. 09-1706, <u>Evelin M. Fernandez, Individually and as Personal Representative of the Estate of Ana Fernandez, Deceased, et al. v. WMATA, et al.</u>, filed on September 8, 2009, are the Personal Representative and children of Ana Fernandez, Deceased.

72.   Ana Fernandez was killed as a result of the conduct of the Defendants as alleged in this Complaint.

73.   Plaintiff Evelin Marisol Fernandez is the daughter of the decedent, Ana Fernandez.

74.   Plaintiff Antonio Robles Fernandez is the son of the decedent, Ana Fernandez.

75.     On August 7, 2009, Plaintiff Evelin Marisol Fernandez was duly appointed in Prince George's County as the Personal Representative of the estate of her deceased mother, Ana Fernandez, (Estate No. 82516).

76.     The Minor Plaintiffs, J.L.F. (DOB: 1995), V.E.F. (DOB: 1997), S.V.A. (DOB: 1999), and J.S.F. (DOB: 2007) are the children of the decedent, Ana Fernandez.

77.     Plaintiffs Antonio R. Fernandez and Evelin M. Fernandez have filed a petition, pending in Montgomery County Circuit Court, for appointment as co-guardians of their minor siblings. Antonio Fernandez and Evelin Fernandez, who are currently responsible for the custody and care of their minor siblings, reside in Montgomery County, Maryland.

78.     Attorney William Foote, Esquire has been appointed by the Circuit Court of Montgomery County, Maryland as Guardian of the Property of the minor Plaintiffs J.L.F., V.E.F., S.V.A. and J.S.F.  Mr. Foote is bringing the claims on behalf of the minor Plaintiffs as the Guardian of their property.

79.     Plaintiffs in Civil Action No. 09-1706 are pursuing all claims for damages under the Wrongful Death and Survival Statutes.

## PLAINTIFFS IN CIVIL ACTION NO. 09-1721

80.     Plaintiff in Case No. 09-1721 is Ercilia Molina an individual who resides at 1445 Ogden Street, N.W. Washington, DC 20010.  Her case, which was originally filed on September 10, 2009, was originally styled Molina v. WMATA.  Plaintiff Molina

hereby includes all the defendants listed herein and above in this action and asserts claims against them in accordance with this Master Complaint.

81. On June 22, 2009, Plaintiff Molina boarded a WMATA Metro train, which was traveling on the Red Line in Washington, D.C. Plaintiff Molina was on the second to the last of a WMATA subway car on the Red Line which was at a standstill. At approximately 5:00 p.m. another subway train was traveling on the same track and violently struck the car in which Plaintiff Molina was located.

82. At the moment of impact, Plaintiff Molina was violently thrown back into her seat. She immediately felt excruciating pain in her neck and back. The subway car was filled with the sounds of people screaming. Plaintiff Molina was terrified. One man walked by her clutching his head and had blood pouring through his hands. Plaintiff Molina saw another woman covered in blood. There was smoke and a putrid smell in the air. Plaintiff noticed she had blood on her clothing.

83. Plaintiff eventually was able to depart the train and exited the Metro station to ground level where she started to walk aimlessly. Plaintiff was in tremendous pain, confused, distraught, forlorn and terrified.

84. As a direct and proximate result of the accident, Plaintiff Molina suffered bodily and emotional injuries which have caused physical and emotional pain and suffering, and which will continue to cause physician and emotional pain and suffering for the foreseeable future and likely the rest of Plaintiff Molina's life. Plaintiff Molina

has been prevented from engaging in work and from freely engaging in daily activities of living and enjoyment.

85.     Plaintiff Molina has incurred and will continue to incur medical and related expenses.   Plaintiff Molina sustained additional damages including loss of earnings from employment and inability to enjoy the normal functions of life.

## PLAINTIFFS IN CIVIL ACTION NO. 09-1762

86.     Civil Action No. 09-1762, is styled Clare E. Wherley, as Personal Representative of the Estates of David F. Wherley, Jr. and Ann C. Wherley v. WMATA et al., which was filed on or about September 17, 2009. Plaintiff Clare E. Wherley was the sister of Decedent David F. Wherley, Jr. and the sister-in-law of Decedent Ann C. Wherley. Plaintiff Clare E. Wherley is the duly qualified Executor and Personal Representative of the Estates of Decedent David F. Wherley Jr. and Decedent Ann C. Wherley pursuant to a will.

87.     On June 22, 2009, Decedent David F. Wherley Jr. and Decedent Ann C. Wherley were was killed as a result of the conduct of the Defendants as alleged in this Complaint.

88.     Decedent David F. Wherley Jr. and Decedent Ann C. Wherley were husband and wife having been married almost forty years. They had two adult children, Elizabeth W. Regan and David C. Wherley, and one grandchild.

89.     Decedent David F. Wherley Jr. was a decorated fighter pilot who flew F16's and F14's during a military career of almost forty years prior to his retirement. He

was the former Commanding General of the D.C. National Guard. On September 11, 2001, Decedent David F. Wherley Jr. ordered fighter planes into the air over Washington, D.C. in response to terrorist attacks that day.

90.     Decedent David F. Wherley Jr. played a large role in continuing and expanding the National Guard's Youth Challenge Program. He worked tirelessly to help the youth of the District of Columbia.

91.     Decedent Ann C. Wherley held a degree in Education from Kutztown University in Pennsylvania. Decedent Ann C. Wherley was a breast cancer survivor, a gourmet cook and a retired mortgage broker. She was also a docent at the United States Botanic Garden and she volunteered extensively at the Family Support Center and with the Youth Challenge Program at the District of Columbia National Guard.

92.     On June 22, 2009, Decedent David F. Wherley Jr. and Decedent Ann C. Wherley were travelling by subway from Walter Reed Army Medical Center after having attended an orientation for volunteers who wanted to work with wounded soldiers.

93.     On June 22, 2009, Decedent David F. Wherley Jr. and Decedent Ann C. Wherley died as they had lived, together and trying to serve those less fortunate than themselves.

94.     Decedent David F. Wherley Jr. and Decedent Ann C. Wherley both suffered premature deaths in the WMATA subway crash.

95.     Upon information and belief, the June 22, 2009 subway train crash caused Decedent David F. Wherley Jr. and Decedent Ann C. Wherley's next of kin/statutory beneficiaries, Elizabeth W. Regan and David C. Wherley, to suffer damages and they seek recovery of all damages permitted under the District of Columbia Wrongful Death Act.  Decedent David F. Wherley Jr. and Decedent Ann C. Wherley's causes of action in negligence survive their deaths and may be pursued by their Estates. Decedent David F. Wherley Jr. and Decedent Ann C. Wherley's Estates seek recovery for all damages permitted under the District of Columbia Survival Act.

96.     The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint Defendant without any contributory negligence on the part of Decedent David F. Wherley Jr. and Decedent Ann C. Wherley.

### PLAINTIFFS IN CIVIL ACTION NO. 09-1774

97.     Civil Action No. 09-1153 is styled Yitzchok Shapiro and his wife, Zelda Shapiro v. Washington Metropolitan Area Transit Authority.

98.     On June 22, 2009 at approximately 4:45 pm, Plaintiff Yitzchok Shapiro boarded a Washington Metropolitan Area Transit Authority (hereinafter "WMATA") Metro train at the Silver Spring station on the "Red Line," heading southbound.  Plaintiff alighted into the third car on that particular train, in about the middle of the car.

99.     At few minutes thereafter, the train on which the Plaintiff was a passenger collided with the rear of a second, stationary southbound train.  The impact and resulting carnage injured the mid and lower dorsal regions of the Plaintiff's Yitzchok Shapiro's

back, with myofascial tightness in the mid dorsal musculature, and also caused him to suffer from serious and acute post-traumatic stress disorder.  This incident may have injured him in other ways.

100.   Following this collision, emergency personnel arrived at the scene and removed Plaintiff Yitzchok Shapiro from the Metro train car and transported him to George Washington Hospital, where he was treated and released. Following his discharge, Plaintiff Yitzchok Shapiro has been under the care of medical doctors and other health care professionals. He will require future medical care and psychotherapy. He has incurred medical charges for these services and is reasonably probable to do so in the future. He has lost time from his employment to seek medical care and in connections with his injuries. All of these damages were proximately caused by the joint and several negligence of the defendants as enumerated in this Master Complaint.

101.   Plaintiff Yitzchok Shapiro will require future medical treatment and care, including but not limited to, physical therapy and rehabilitation treatments and psychiatric and psychological care for post-traumatic stress disorder. He has suffered and will continue to suffer pain, discomfort, functional impairments and other diminutions in the quality of his life, including but not limited to, restrictions on his daily activities.  It is unknown at this time whether his condition will be permanent, but plaintiff reserves the right to so contend.

102.   Plaintiffs Yitzchok & Zelda S. Shapiro are husband and wife and were so at the time of the incident which is the subject matter of this Master Complaint. They

have lost the consortium of each other. For such loss, the Plaintiffs demand damages against the Defendants herein jointly and severally

### PLAINTIFFS IN CIVIL ACTION NO. 09-1834

103.    Plaintiffs in Civil Action No. 09- 1834, Kenneth Hawkins and Andrea Mitchell, as Co-Personal Representatives of the Estate of Dennis Hawkins v. Washington Metropolitan Area Transit Authority, et. al. are Personal Representatives of the Estate of Dennis Hawkins.

104.    Dennis Hawkins died as a result of the conduct of the Defendants, as alleged in this Complaint.

105.    At all relevant times hereto, the decedent, Dennis Hawkins, was a resident of the District Columbia.

106.    Plaintiff Kenneth Hawkins is the brother of Dennis Hawkins, deceased.

107.    Plaintiff Andrea Mitchell is the niece of Dennis Hawkins, deceased.

108.    On July 23, 2009, Plaintiffs Kenneth Hawkins and Andrea Mitchell were duly appointed Co-Personal Representatives of the Estate of Dennis Hawkins by the Probate Division of the Superior Court of the District of Columbia. Plaintiffs reside in the District of Columbia

109.    Upon information and belief, the June 22, 2009 subway train crash caused Decedent Dennis Hawkins' next of kin/statutory beneficiaries/rightful heirs to suffer damages and they seek recovery of all damages permitted under the District of Columbia Wrongful Death Act.  Decedent Decedent's causes of action in negligence survive his

death and may be pursued by his Estate. Decedent Dennis Hawkins' Estate seeks recovery for all damages permitted under the District of Columbia Survival Act.

110.   The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Decedent Dennis Hawkins.

### PLAINTIFFS IN CIVIL ACTION NO. 09-1993

111.   Civil Action No. 09-1993, styled Michael A. Moore v. Washington Metropolitan Area Transit Authority, et al., was filed on or about October 21, 2009.

112.   On Monday, June 22, 2009, at approximately 4:58 p.m., Plaintiff Michael A. Moore was a passenger on the second car of a Metro train owned and operated by defendant WMATA when the train collided at high speed with a second, stationary Metro train on the above-ground southbound Red Line track between the Takoma and Fort Totten stations in the District of Columbia.

113.   During the collision, the lead car of the striking train telescoped and overrode the rear car of the stationary train.  The collision created a horrific scene of devastation and wreckage, leaving numerous people deceased, badly injured, and trapped in the crash debris.  Plaintiff Michael A. Moore saw the dead and wounded, assisted others in dismounting the train, assisted several of the wounded, and unsuccessfully attempted to reach a passenger trapped in the wreckage between the two trains who was crying for help and ultimately died from her injuries.

114.   As a direct and proximate result of the conduct of the defendants as alleged in this Complaint, Plaintiff Michael A. Moore sustained serious and permanent injuries including but not limited to injuries to his neck and right shoulder, post-traumatic stress disorder, and severe emotional distress.  Because of his injuries, Plaintiff Michael A. Moore has been caused to incur and will incur in the future medical and related expenses, has suffered a loss of earnings and an impairment of his earning capacity, has been and will continue to be prevented from engaging in his customary activities, and has been caused to undergo and will undergo in the future physical and mental pain and suffering.

115.   The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Plaintiff Michael A. Moore.

### PLAINTIFFS IN CIVIL ACTION NO. 09-2061

116.   Civil Action No. 09-2061, is styled <u>Daryl D. Smith v. WMATA</u>, which was filed on or about November 02, 2009.

117.   On 4:58 p.m. on June 22, 2009, Plaintiff Daryl D. Smith was a passenger on the first car of Defendant WMATA's subway train traveling on the Red Line, which violently struck another stopped Defendant WMATA subway train in the rear.  Daryl D. Smith suddenly and violently thrown as a result of the collision.

118.   Mr. Smith and the other passengers were trapped in the devastated and crushed remains of the car which was filled with smoke, dust and twisted metal.

119.    Outside of the train there were severely injured passengers bleeding and moaning with exposed bone and open gashes and other serious wounds who were on the ground and on a fence.

120.    Inside Plaintiff Daryl D. Smith's subway train there was injury, smoke and destruction surrounding him; he feared for his life, trapped inside the train, and for the lives of others.

121.    Plaintiff Daryl D. Daryl D. Smith, Jr. attempted to break the reinforced glass window of the car and with the encouragement of the other passengers he eventually managed to do so by picking up a fire extinguisher and hitting the glass until he shattered it.

122.    Daryl D. Smith, Jr. was bloody and shirtless, and was suffering from an eight-inch gash in his head that would require six staples to close.

123.    Plaintiff Daryl D. Smith suffered severe emotional distress due to the horrific nature of the crash and its aftermath, including witnessing fatal injuries to other passengers in the rail car he was in as well as injuries to his friend, Amari Danielle Washington.

124.    As a direct and proximate result of conduct of the Defendants as alleged in this Complaint, Plaintiff Daryl D. Smith suffered bodily injuries, which have caused, and will continue to cause, physical and emotional pain and suffering for the rest of his life. Plaintiff Daryl D. Smith has incurred, and will continue to incur, medical, therapeutic, and related expenses.  Plaintiff Daryl D. Smith sustained additional damages including

loss of earnings from employment past, present and future, and the inability to enjoy the normal functions of life.

125.   The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Plaintiff Daryl D. Smith.

<u>**PLAINTIFFS IN CIVIL ACTION NO. 09-2062**</u>

126.   Civil Action No. 09-2062, is styled <u>Amari Danielle Washington v. WMATA</u>, which was filed on or about November 02, 2009.

127.   At 4:58 p.m. on June 22, 2009, Plaintiff Amari D. Washington was a passenger on the first car of Defendant WMATA's subway train traveling on the Red Line, which violently struck another stopped Defendant WMATA subway train in the rear and she was violently thrown.

128.   Ms. Washington and the other passengers were trapped in the devastated and crushed remains of the car which was filled with smoke, dust and twisted metal.

129.   Amari D. Washington, who had been thrown about the crushed car, was bloody and crying.  She had lost consciousness and had abrasions of her left foot and thigh.

130.   Outside of the train there were severely injured passengers bleeding and moaning with exposed bone and open gashes and other serious wounds on the ground and on a fence.

131.    Inside Plaintiff Amari D. Washington's subway train there was injury, smoke and destruction surrounding her; she feared for her life, trapped inside the train, and for the lives of others.

132.    As a direct and proximate result of conduct of the Defendants as alleged in this Complaint, Plaintiff Amari D. Washington suffered bodily injuries, which have caused, and will continue to cause, physical and emotional pain and suffering for the rest of her life.  Plaintiff Amari D. Washington has incurred, and will continue to incur, medical, therapeutic, and related expenses.  Plaintiff Amari D. Washington sustained additional damages including loss of earnings from employment past, present and future, and an inability to enjoy the normal functions of life.

133.    Plaintiff Amari D. Washington suffered severe emotional distress due to the horrific nature of the crash and its aftermath, including witnessing fatal injuries to other passengers in the rail car he was in as well as injuries to her friend, Daryl D. Smith.

134.    The above injuries and damages were proximately caused by the conduct of the Defendants as alleged in this Complaint without any contributory negligence on the part of Plaintiff Amari D. Washington.

**PLAINTIFFS IN CIVIL ACTION NO. 09-2171**

135.    Plaintiffs in Civil Action No. 09-2171, <u>Carol Anne Douglas and Wilcox S. Doolittle, Jr., as Co-Personal Representatives of the Estate of Mary Andress Doolittle,</u>

Deceased v. WMATA, et.al., filed on November 13, 2009, are the Personal Representatives of Mary Andress Doolittle, Deceased.

136.   Plaintiffs are represented by Mitch Lambros, Esq., Lambros & Lambros, Michael H. Feldman, Esq., P. Matthew Darby, Esq., and Berman, Sobin, Gross, Feldman and Darby, LLP.

137.   Mary Andress Doolittle was killed as a result of the conduct of the Defendants as alleged in this Complaint.

138.   On  September 8, 2009, Plaintiffs Carole Anne Douglas and Wilcox S. Doolittle, Jr., were appointed in   the Superior Court of the District of Columbia  as the Co-Personal Representatives of the Estate of Mary Andress Doolittle (2009 ADM 000927)

139.   Plaintiffs in Civil Action No. 09-2171 are pursuing all claims for damages under the Survival Statutes.

140.   As a direct and proximate result of the negligence of Defendant, WMATA, Train 112, on which Mary Andress Doolittle was a passenger, collided with Train 214 between the Takoma and the Fort Totten Metrorail stations in the District of Columbia on June 22, 2009, at 5:02 p.m., causing Mary Andress Doolittle to sustain severe, multiple and lethal injuries leading to her death, as well as to severe pain and suffering, fear and anticipation of impending injury and death, emotional distress, both prior to and after impact of the colliding trains, medical expenses, and lost wages, past, present and future.

**PLAINTIFFS IN CIVIL ACTION NO. 10-0251**

141.   The Plaintiff in Civil Action No. 10-251 is Jose Bimbo, II, Individually and as Personal Representative of the Estate of Lavonda Nicole King, deceased, which was filed on February 18, 2010.

142.   Plaintiff Jose Bimbo, II, is the father of Lavonda Nicole King's youngest child, EJK, and has been appointed Personal Representative of the Estate of Lavonda Nicole King.  Lavonda Nicole King was a resident of the District of Columbia, and was an entrepreneur and cosmetologist.

143.   On June 22, 2009, at approximately 5:02 p.m., Lavonda Nicole King, age 23, was a passenger for hire and was riding on Car 1079, the first car of WMATA Train 112 which collided with Train 214 causing Lavonda Nicole King to sustain severe, multiple and lethal injuries leading to her death, as well as to experience severe pain and suffering and emotional distress, both prior to and after impact of the colliding trains.

144.   Plaintiff Jose Bimbo, II, is the father of Lavonda Nicole King's youngest child, EJK.  Plaintiff Jose Bimbo, II, has been duly appointed as Personal Representative of Lavonda Nicole King's estate by the Probate Division of the Superior Court of the District of Columbia on February 1, 2010, (Administrative No.000081).

145.   The decedent's right of action for injuries prior to her death caused by the negligent conduct of the Defendants survives in favor of Jose Bimbo, II, as the duly appointed Personal Representative of the Estate of Lavonda Nicole King.  As a direct and proximate result of the negligence of the defendants as described above Lavonda

Nicole King sustained severe, multiple and lethal injuries leading to her death, as well as experienced severe pain and suffering and emotional distress, both prior to and after impact of the colliding trains.

146.   Plaintiffs in Civil Action No. 10-251 are pursuing all claims for damages under the Wrongful Death and Survival Statutes.   The Plaintiff is survived by the following wrongful death beneficiaries: her children, EJK, 2 years old, and AK, 4 years old who lived with and were financially and otherwise dependent on the decedent.

## **RELEVANT FACTS**

147.   On Monday, June 22, 2009, about 4:58 p.m., eastern daylight time, Washington Metropolitan Area Transit Authority Metrorail train 112 collided with the rear end of stopped train 214 near the Fort Totten station in Washington, D.C.   Both trains were traveling inbound on the Red-Line segment of the Metrorail system towards Metro Center.   The Plaintiffs or decedents previously identified in this pleading were passengers on WMATA Train 112, which was traveling on the Red Line from Union Station toward Silver Spring.

148.   Train 214 was being operated by Brian Brooks, an agent, servant and employee of WMATA.   Train 214 had stopped before entering the Fort Totten station due to a loss of speed commands and its operator's observation that another train already was occupying the station platform.   The operator of Train 214 was operating in manual mode, meaning that he had disengaged his train from acting in accordance with

electronic speed commands for his train.  In a post-collision interview with the NTSB, the operator of Train 214 indicated that he did not trust the automatic system.

149.    Train 112 was being operated by Jeanice McMillan, an agent, servant and employee of WMATA.  Train 112 was following train 214 in automatic mode.  Under automatic mode, the train moves or stops in response to electronic commands and not in response to the operator.  However, the operator remains responsible at all times for the safe operation of the train and can override the electronic commands.  According to passenger statements from train 112, before the collision, the train operator announced they were stopping because there was a train ahead.  Train 112 slowed and then stopped. Train 112 began moving again.   The operator of Train 112 permitted the train to remain on the automatic train control system and to be taken up to a speed of 55mph even as she approached a curved section of track nearing the Fort Totten Station.

150.    As with all Metro trains, Train 112 was equipped with emergency brakes that could be activated by the operator by depressing a button known as the "mushroom."  The first two cars of the moving WMATA train (Train 112) were two months overdue for scheduled maintenance of some braking components.

151.    Train 214 was stopped on the track ahead and was partially visible to the operator of Train 112 at a distance of over 1100 feet. If the operator of Train 112 had been paying proper attention and responded at that point to the presence of Train 214 by activating "the mushroom," an emergency braking system, the train would have braked to a stop before reaching Train 214 and no collision would have occurred.  Instead, the

operator of Train 112 did not activate the mushroom until about 300 feet from Train 214. At the point of activation, Train 112 was traveling approximately 52 mph, far too fast to stop in time.

152.   Train 112 violently collided with Train 214, pushing Train 214 forward seven feet.  The force of the impact sheared Car 1079 of Train 112, pushing part of it onto the roof of the trailing care of Train 214 and slamming the rest into the body of Train 214.  Two-thirds of Train 112's lead car was crushed when the car telescoped. The violent collision resulted in the deaths of 9 people, physical injuries to at least 70-80 other individuals, and emotional injuries to everyone who experienced the horrific event and its aftermath.

153.   There was no communication between the operators of Train 112, the stopped Train 214 or the Metrorail operations control center before the collision.

154.   If the automatic train control system under which Train 112 was operating had functioned properly, the presence of Train 214 on the track ahead would have been detected and Train 112 would have slowed and stopped on its own averting a collision. However, the train detection system on the portion of track where Train 214 was stopped was malfunctioning and not detecting trains.  This condition at this portion of track had been known to WMATA since at least June 17, 2009, was the subject of a pending work order, but was never addressed before the collision.  As a result, the automatic system had Train 112 running at 52mph based on the false reading of no train being present ahead.

155.   The train detection system utilized by WMATA is a dated system whose design goes back to the early 1970s.  While another transit system using a similar train detection system recognized its limitations and installed an additional train detection system over 20 years ago, WMATA has never done so.

156.   WMATA's system of train detection relies upon the use of transmitters, receivers, and impedance bonds.  The transmitters and receivers are located in the lower levels of train stations.  They send and receive electrically high frequency audio signals.  The impedance bonds connect the two rails of the track at regular intervals.  For the purpose of detecting trains, tracks are divided into blocks.  For each block, there is a transmitter, an impedance bond at each end, and a receiver.  The transmitter sends a signal through a cable to the impedance bond at one end of the block.  When a train is not present, the signal runs along the rails to the impedance bond at the other end of the block.  The signal then returns back through a cable to the receiver thus completing the electrical circuit.  If the circuit is completed in this way, a relay is energized and the block reports as vacant.  If a train is present in a block, however, , however, its metal wheels allow the signal to cross over from one rail to the other before it reaches the impedance bond causing interruption of the circuit and de-energizing of the relay and the block registers as occupied.

157.   WMATA's train detection system was composed of components from GRS, the predecessor corporation to Defendant Alstom.  However, WMATA was in the midst of a 4-year track circuit replacement program.   GRS impedance bonds and

receivers/transmitters were being replaced with US&S impedance bonds and US&S AF-800W modules. US&S is the predecessor corporation to Defendant Ansaldo. WMATA's process was to first have its personnel replace the GRS impedance bonds with US&S impedance bonds and then later, have US&S contracting personnel replace the transmitters/receivers. As a result, there would be a period of time when US&S bonds were being used with GRS transmitters/receivers. Both Alstom's and Ansaldo's agents, servants, and employees were aware of this approach, and as indicated, Ansaldo's agents, servants and employees directly approved, assisted and facilitated it. In 2004, Alstom sent a warning letter to its many customers, including WMATA, warning generally of the danger of mixing and matching its components with components from other manufacturers. However, Alstom personnel, as well as Ansaldo personnel, were aware of the mixing and matching of bonds as confirmed in WMATA's Engineering Bulletin dated October 6, 2006:

> Replacement of Substation Return Impedance Bonds in GRS track circuits with US&S impedance bonds is approved by CENS [a division of WMATA] for track circuits in the scope of the F05143 contract with US&S. CENS has had numerous lengthy technical discussions on this matter with the engineers of both track circuit designers from US&S and ALSTOM.

158. This same October 6, 2006 engineering bulletin specified that after installation of US&S bonds, track circuits were required to be "shunt tested" in three places: at each end of the block and also in the middle. A shunt connects two rails with a conductor of a given resistance to simulate the presence of train wheels at that location.

The track circuit is monitored to see if the circuit de-energizes as it should, thus indicating the presence of a train.  If the circuit does not de-energize, this condition is referred to as a "loss of shunt" or "diminished shunt sensitivity."  The shunt testing procedure specified in the October 6, 2006 Engineering Bulletin was different than previous shunt testing procedures, which were contained in WMATA's February 24, 1982 Preventive Maintenance Inspection (PMI) 11000 which did not require testing in the middle of a block.  However, WMATA maintenance personnel were not made aware of the shunt testing requirements of the October 6, 2006 Engineering Bulletin.

159.   The crash at issue occurred at Red Line track section B2-304.  The crash occurred because of a failure of the train detection system for that block of track.  On June 17, 2009, a WMATA crew swapped a US&S impedance bond for a GRS impedance bond on this section and observed train detection problems immediately afterwards.  WMATA's Maintenance Operations Center (MOC) was made aware of this problem by the crew.  The problem was that the track circuit was "bobbing." A bobbing track circuit is defined as when an isolated track circuit transitions from vacant, to occupied and back to vacant again.  (This condition also has been referred to within WMATA as "picking" and as "loss of shunt.")  The crew was not able to fix the problem. After notifying MOC of the bobbing while still on site, the crew did not hear anything more about the bobbing track circuits until the day of the crash.  The crew did not notify the Operations Control Center (OCC).  Upon information and belief, the crew

did not perform shunt testing in the middle of  block B2-304 after swapping in the US&S bond.

160.   A work order was opened by the WMATA Maintenance Operations Center (MOC) on June 17, 2009 for this train detection problem but never acted upon before the crash on June 22, 2009.  In particular, on June 17, 2009, MOC opened work order # 7169867 at 6:50 am, for a report that track circuit B2-304 was bobbing. However, at no time during the five days from then until the crash, did WMATA ever act on its own work order for the exact serious train detection problem that caused the June 22 crash.

161.   Coincidentally, a separate work crew was at this same section of track on June 18, 2009 to perform preventive maintenance.   The preventive maintenance specifically was to test the train detection system.  This crew also noticed the bobbing. However, despite the presence of this serious train detection problem, this crew did not report the bobbing to the Maintenance Operations Center.  This crew was not aware of the open work order upon which MOC never acted before the crash.   This crew did not notify the Operations Control Center.   The crew followed PMI 11000, but not the October 6, 2006 Engineering Bulletin, and the block was not shunt tested in the middle.

162.   Thus, the crash occurred despite WMATA knowing of the exact train detection problem that led to the crash five days in advance.  The crash would not have occurred if MOC had acted on its own work order.   The crash also would not have occurred if WMATA had notified its train operators to operate in manual mode for this

stretch of track given the failings of the automatic system. Instead, WMATA permitted its operators to run trains through this area in automatic mode despite being on notice of a serious train detection problem. Additionally, if the June 18, 2009 crew had reported the bobbing to MOC, MOC likely would have been forced to recognize the urgency of the train detection problem and likely taken actions that would have prevented the June 22, 2009 crash. Additionally, if either work crew had shunt tested in the middle of block B2-304, as required by October 6, 2006 Engineering Bulleting, a failure of shunt likely would have been detected and measures would have been taken by MOC and the Operations Control Center (OCC) that would have prevented the June 22, 2009 crash. In particular, following the June 22, 2009 crash, the NTSB performed shunt testing on block B2-304 in accordance with the October 6, 2006 Engineering Bulletin and it failed in the middle. Review of recorded data by the NTSB following the June 22, 2009 crash showed that there was frequent loss of shunt in block B2-304 during the entire five day period from June 17, 2009 up until the crash.

163.    It was well know within WMATA that train detection problems frequently ensued after replacing GRS bonds with US&S bonds. This is apparent from NTSB interviews with WMATA service technicians. The problems that occurred at Red Line track section B2-304 following the swapping of a GRS bond with a US&S bond were consistent with a long history of similar problems following swapping of bonds.

164.    It also was well known to WMATA and to Alstom, dating back to a near miss incident at Rosslyn Station on June 7, 2005, that train detection failures were

occurring in track circuits that had GRS impedance bonds only.  In particular, on that date, there was a loss of train detection at a section of track near Rosslyn Station that used GRS impedance bonds. As stated in WMATA's June 12, 2005 Engineering Bulletin and ATC [Automatic Train Control] Safety Notice:

> Without detecting train 420, the speed command logic provided speed commands to the following train (408) up to 65 MPH for passage through the occupied track. The operator of train 408, operating in ATO [automatic train operation], considered his speed excessive with tail lights in-sight ahead and took his train out of ATO by pressing his ATO Stop button, effecting full service braking to a stop. The operator of train 408 reported that he stopped 35 feet from the rear of the train ahead…After train 420 moved on and train 408 pulled forward, the rear of train 408 became undetected. The operator of the following train, 913, also operating in ATO, considered his speed excessive and hit his emergency brake. The operator of train 913 reported that he stopped 20 feet short the train ahead.

WMATA implemented an absolute block of this area of track in order to investigate on site. As documented in the 06/19/05 Safety Notice, Alstom's representative was directly involved in the ensuing investigation:

> The symptoms could only be caused by a bypath that allowed return signal around a shunt on the track. Any low impedance connection between the transmitter and receiver bond-lines could theoretically produce the symptom. …WMATA engineers contacted the manufacturer/supplied, ALSTOM, seeking assistance with the unusual symptoms. … The ALSTOM design engineer, Jack Ellsworth, could not help by phone. He came to perform site inspections and tests on Tuesday 6-14-2005.

The investigation revealed that there had been a loss of train detection with previous "incidents" at this location:

> The Log Book in the Rosslyn Train Control Room indicated a similar incident on October 12, 2004. … A ten year review of MARS incident reports revealed the 10-12-2004 incident and two other emergency brake applications that could not be ruled out as similar incidents.

However, as also confirmed in the 06/19/05 Safety Notice, the onsite investigation was ended before the cause of the loss of train detection was confirmed:

> Because this problem was inconveniencing patrons for a week already, a decision was made to replace the bond-line cables immediately, and have the work done by Monday morning revenue service. In addition to the bond-lines, Engineering requested both track modules and both impedance bonds, as well as their connecting cables be replaced.

165.   WMATA's June 12, 2005 Engineering Bulletin and ATC Safety Notice was crystal clear that this type of train detection problem  - the exact type of problem that led to the June 22, 2009 crash - posed potentially catastrophic risk and had to be treated as an emergency safety issue whenever detected by WMATA personnel:

> Diminished shunt sensitivity can cause a partial loss of train detection . . .  Based on block design and the braking ability of the following vehicle, it could also lead to a rear-end collision. Early detection of this problem is imperative.
>
> **<u>WHAT TO DO WHEN YOU FIND THIS PROBLEM:</u>**
> 1. **IMMEDIATELY** (<u>Do not wait for permission to do this</u>.)  Drop the track circuit by the receiver amplifier switch.
>
> 2. Notify MOC/OCC of your finding and action.  Have MOC contact your supervisor, your area manager, your superintendent, or an ATC engineer, right away
>
> 3. Turn down the receiver amplifier gain all the way, pick-up the receiver amplifier switch and then (with the track

circuit unoccupied) slowly increase the gain until the
track circuit just barely picks.

4.  Continue monitoring the waveforms of the track circuit.

5.  If the problem persists and the track relay is picking
    before the next track circuit has been dropped for at least
    three seconds, then drop the track circuit and contact
    MOC immediately.

Thus, it was WMATA's required procedure that maintenance personnel aware of

diminished shunt sensitivity – such as with bobbing or a failed shunt testing– act

urgently, drop the circuit so that the block always registers occupied and notify MOC

and OCC.   It was WMATA's stated procedure that dimished shunt sensitivity be

rectified urgently since it presented a direct safety risk of a rear end collision.

166.   WMATA issued a follow-up Engineering Bulletin and ATC Safety Notice

on June 19, 2005 concerning diminished shunt sensitivity which states in part as follows:

Track circuits theoretically more susceptible to this type
malfunction are expected to include any of the following
parameters, track circuits far from the TCR, longer than
average track circuits, track circuits set to higher transmitter
output voltages and track circuits using higher audio
frequencies.

We will be conducting a serious of tests to ensure that long
term preventive measures are comprehensive and efficient.
In the interim, it is important that all ATC maintenance
employees are aware of this potential failure mode.  Please
read the *June 12, 2005 Engineering Bulletin and ATC Safety
Notice.*

Thus, WMATA recognized and knew that train detection problems were more likely to

ensue with increased voltage to tracks.  Based on NTSB interviews with WMATA

maintenance personnel, WMATA was well aware that swapping out GRS bonds for US&S bonds required increasing of voltage to tracks.

167.   There was another near miss incident due to a failure of train detection on March 2, 2009 near Potomac Station.  A train in Automatic Train Operation (ATO) mode (Train #932) violated a block and came dangerously close to the leading train at Potomac Avenue Station. . . There was no indication that the train operator or the controllers on duty in the OCC were aware of this failure of the Automatic Train Protection (ATP) system at the time of occurrence.  The Tri-State Area Oversight Commission, in an April 29, 2009 letter to WMATA's chief safety officer, specifically warned "Due to the safety-critical nature of this hazardous condition, and the potentially catastrophic consequence of a failure of the ATP system, TOC asks that WMATA conduct a formal investigation into the root cause(s) of the failure."

168.   The movements of trains 214 and 112 were displayed on large screens at WMATA's Operations Control Center.  This display system shows alarms.  The duties of an OCC controller include the monitoring of alarms.  There are alarms for loss of train detection.  Bobbing triggers these alarms.  However, bobbing had become such a frequent occurrence that  WMATA deliberately reprogrammed their computer system to automatically erase these alarms.  In other words, WMATA deliberately decided that warnings consistent with loss of train detection were to be automatically dismissed.  If the warnings were not programmed to be automatically dismissed, thus requiring the

OCC controller to act upon them, a controller likely would have communicated with Train 112 and the June 22, 2009 collision likely would have been avoided.

169.   WMATA's deliberate indifference to safety considerations also extended to its rail cars.  In particular, WMATA was well aware that it was operating with train cars that had inadequate crashworthiness characteristics.

170.   The stopped train, 214, was a six-car train in passenger service consisting of two 2-car sets of 3000-series transit railcars and one 2-car set of 5000 series transit railcars.  The striking train, 112, was a six-car train in passenger service consisting of three 2-car sets of 1000-series transit railcars.  The six cars in WMATA Train 112 were part of the 1000 series, which are some of the oldest in the transit network and were purchased between 1974 and 1978 from Rohr Industries.

171.   Based upon repeated investigations, Federal investigators considered the Rohr cars to be unsafe because of a tendency during a crash to collapse into one another like a telescope, reducing the "survivability space," which is the area in a car in which passengers can escape harm.

172.   After a Rohr train telescoped during a crash on November 3, 2004 at the Woodley Park-Zoo/Adams Morgan Metrorail station, the National Transportation Safety Board ("NTSB") recommended in a report, released on March 23, 2006, that WMATA retire the Rohrs or strengthen their frames to prevent collapse.

173.   Defendant WMATA refused to follow the NTSB recommendations stating that the cars make up one-third of the fleet and that WMATA could not afford to remove

them from service ahead of their planned retirement in 2014, and that retrofitting would be costly and impractical.

174.   After two WMATA trains collided in a fatal accident, on January 6, 1996, at the Shady Grove Metrorail station, the NTSB recommended in a report, released on October 29, 1996, that WMATA strengthen the skeleton of its rail cars to prevent telescoping.

175.   Again, Defendant WMATA refused to follow the NTSB recommendation on the grounds that it would be too expensive and disruptive to carry out.  The NTSB disagreed with WMATA's stances, calling it "unacceptable" at the time.

176.   At no time did WMATA give any warning to its passengers concerning train detection problems or the lack of crashworthiness of its series-1000 rail cars.

177.   ARINC contracted with WMATA to upgrade the train command and control systems of WMATA to improve the safety efficiency of the operation by better managing and displaying the various types of information used to operate the system. At times relevant hereto ARINC supplied automatic train control components, computer software systems and consulting services for the WMATA system.

178.   Defendant ARINC supplied services to WMATA in the areas of systems integrations, command and control functions, and human-machine interface for the train control system.

179.   ARINC developed the crash-avoidance system for WMATA known by the acronym AIM (Advanced Information Management). That system is designed to

monitor, track and provide automatic train control to avoid train collisions. ARINC undertook a conversion of the WMATA system from ROCS (Rail Operations Computer System) to ARINC's own AIM system, which was designed, sold and installed by ARINC for WMATA. ARINC also subcontracted with Macro Corporation to assist in this large scale project. This work was performed in the 2007 time period.

180. ARINC was aware that the safety alarms which were designed to warn if there were trains on the tracks or not, which were part of the ROCS system and which alarmed in the command center of WMATA, known as the "OCC" (Operations Central Control), were giving out false alarms thousands of times a day. ARINC undertook to fix the alarm problem as part of the implementation of their new AIM system.

181. ARINC's AIM was a computer-aided dispatching system which featured a centralized yard control room, three satellite yard control rooms, fiber-optic communication links, data collection devices and the necessary software. The new system also included an automated graphical electronic display of the yard layout, indicating track occupancy and switch positions, all of which was provided and installed for WMATA by ARINC.

182. ARINC's AIM alarm system did not function properly as there were approximately 3,000 failed vacant alarms a day and approximately 5,000 failed occupant alarms a day in the train traffic control system. The result of these failed alarms was that the system lost all of its utility as there was no way for OCC controllers to determine which alarms, if any, were legitimate and demanded action. WMATA and ARINC then

actually disabled these alarms as a result of the high volume of false alarms thereby eliminating this crucial safety function of the train system and exposing passengers.

183.   Despite the removal of this crucial safeguard, WMATA and ARINC continued to operate the trains on automatic control, did not switch to manual mode and did not advise the train operators of these alarm failures and other deficiencies in the train traffic control system and failed to warn them that the automatic train control mode may not detect trains ahead of them.

## COUNT I
### (Negligent Operation of Rail System:  Defendant WMATA)

184.   The Plaintiffs incorporate by reference paragraphs 1-183 and further allege that at all times mentioned herein, WMATA's trains, railroad operations, tracks and adjoining railroad tracks (hereinafter "the subway property") were owned, controlled, operated, managed, constructed, maintained, repaired, designed, evaluated, built, overseen, patrolled and supervised by WMATA.

185.   Plaintiffs further allege that on June 22, 2009, and prior thereto, Defendant WMATA was responsible for maintaining and ensuring the safe use and proper condition of the railroad operations and property, including locomotives, trains, signs, signals, switches, safety devices, communication devices and other equipment at and along the subway property, and for properly and safely managing, overseeing and coordinating the travel of railroad trains upon and along said property.

186.   At all times mentioned herein, Defendant WMATA, as a common carrier, owed a duty of reasonable care to the passengers, including the Plaintiffs and decedents previously identified in this pleading.

187.   On and prior to June 22, 2009, the tracks between Takoma and Fort Totten Metrorail stations in the District of Columbia, the trains, signs, signals, switches, safety devices, communication devices, and other equipment located in the vicinity were, as a result of the negligent or other culpable conduct of WMATA, in an improper, dangerous and/or defective condition that was known or should have been known by Defendant WMATA that created a substantial risk of injury when the area, trains and equipment were used in a reasonably foreseeable manner.

188.   Plaintiffs further allege that Defendant WMATA negligently, carelessly and wrongfully failed to take reasonable precautions to prevent injury to its passengers and to guard them from injury and death, by among other respects, failing to properly control and maintain its equipment, including but not limited to failure to follow its own maintenance and operations procedures, failure to comply with regulatory requirements and standards adopted y regulatory requirements, and failure to comply with accepted standards within the industry.

189.   Plaintiffs further allege that as a direct and proximate result of the negligence of Defendant WMATA, Train 112, on which the Plaintiffs and decedents previously identified in this pleading were passengers, collided with Train 214 between the Takoma and the Fort Totten Metrorail stations in the District of Columbia on

June 22, 2009 at 5:02 p.m. causing serious injuries to the Plaintiffs previously identified in this pleading and causing the deaths of the decedents previously identified in this pleading.

### COUNT II
### (Negligence – Failure to Repair or Address Track Circuit B2-304: Defendant WMATA)

190.    The Plaintiffs incorporate by reference paragraphs 1-189 and further allege that at all times mentioned herein, WMATA's trains, railroad operations, tracks and adjoining railroad tracks (hereinafter "the subway property") were owned, controlled, operated, managed, constructed, maintained, repaired, designed, evaluated, built, overseen, patrolled and supervised by WMATA.

191.    Plaintiffs further allege that on June 22, 2009, and prior thereto, Defendant WMATA was responsible for maintaining and ensuring the safe use and proper condition of the railroad operations and property, including locomotives, trains, signs, signals, switches, safety devices, communication devices and other equipment at and along the subway property, and for properly and safely managing, overseeing and coordinating the travel of railroad trains upon and along said property.

192.    At all times mentioned herein, Defendant WMATA, as a common carrier, owed a duty of reasonable care to the passengers, including the Plaintiffs and decedents previously identified in this pleading.

193.    On June 17, 2009, WMATA's Maintenance Operations Center was informed directly by a WMATA work crew that train detection circuit B2-304 was

bobbing, and thus, not detecting the presence of trains reliably.  Under WMATA's own Engineering Bulletin and ATC Safety Notice dated June 12, 2005, which both the crew and MOC knew or should have known of, the crew and/or MOC were required to notify OCC but failed to do so.  MOC issued a work order for the bobbing track circuit which languished with no action taken whatsoever until after the June 22, 2009 crash.  The crew and MOC and WMATA also were required to treat the bobbing track circuit as a serious safety issue requiring urgent action but failed to do so.  The June 17, 2009 work crew was required to perform shunt testing in accordance with the October 6, 2006 Engineering Bulletin but failed to do so.  Prior to June 22, 2009, the tracks between Takoma and Fort Totten Metrorail stations in the District of Columbia, the trains, signs, signals, switches, safety devices, communication devices, and other equipment located in the vicinity were, as a result of the negligent or other culpable conduct of WMATA, in an improper, dangerous and/or defective condition that was known or should have been known by Defendant WMATA that created a substantial risk of injury when the area, trains and equipment were used in a reasonably foreseeable manner.

194.    On June 18, 2009, a preventive maintenance crew arrived at the same section of track and directly observed the bobbing track circuit.  The crew, in violation of required procedures, failed to notify MOC or OCC and left the track with the bobbing track circuit in place.  The June 18, 2009 work crew was required to perform shunt testing in accordance with the October 6, 2006 Engineering Bulletin but failed to do so.

195.   WMATA, being aware of the failure of train detection at the B2-304 track circuit and the imminent threat of harm that it presented, was required to repair the circuit immediately and/or take precautions to avoid the known risk of a rear end train collision due to failed train detection, such as requiring trains to operate in manual mode and notifying train operators of the loss of reliable train detection at B2-304.  Any of these steps would have prevented the June 22, 2009 crash.  WMATA negligently, carelessly and recklessly failed to take any of these actions.  Repairing and failing to address broken equipment that presents a direct safety hazard is not discretionary.

196.   Plaintiffs further allege that as a direct and proximate result of the negligence of Defendant WMATA, Train 112, on which the Plaintiffs and decedents previously identified in this pleading were passengers, collided with Train 214 between the Takoma and the Fort Totten Metrorail stations in the District of Columbia on June 22, 2009 at 5:02 p.m. causing serious injuries to the Plaintiffs previously identified in this pleading and causing the deaths of the decedents previously identified in this pleading.

## COUNT III
### (Negligence - Operator Negligence: Defendant WMATA)

197.   The Plaintiffs incorporate by reference paragraphs 1-196 and further allege that at all times mentioned herein, WMATA's trains, railroad operations, tracks and adjoining railroad tracks (hereinafter "the subway property") were owned, controlled, operated, managed, constructed, maintained, repaired, designed, evaluated, built, overseen, patrolled and supervised by WMATA.

198.   Plaintiffs further allege that on June 22, 2009, and prior thereto, Defendant WMATA was responsible for maintaining and ensuring the safe use and proper condition of the railroad operations and property, including locomotives, trains, signs, signals, switches, safety devices, communication devices and other equipment at and along the subway property, and for properly and safely managing, overseeing and coordinating the travel of railroad trains upon and along said property.

199.   At all times mentioned herein, Defendant WMATA, as a common carrier, owed a duty of reasonable care to the passengers, including the Plaintiffs and decedents previously identified in this pleading.

200.   Train 112 was being operated by Jeanice McMillan, an agent, servant and employee of WMATA.   Train 112 was following train 214 in automatic mode.   Under automatic mode, the train moves or stops in response to electronic commands and not in response to the operator.   However, the operator remains responsible at all times for the safe operation of the train and can override the electronic commands.   According to passenger statements from train 112, before the collision, the train operator announced they were stopping because there was a train ahead.   Train 112 slowed and then stopped. Train 112 began moving again.   The operator of Train 112 permitted the train to remain on the automatic train control system and to be taken up to a speed of 55mph even as she approached a curved section of track nearing the Fort Totten Station.

201.   As with all Metro trains, Train 112 was equipped with emergency brakes that could be activated by the operator by depressing a button known as the

"mushroom."  The first two cars of the moving WMATA train (Train 112) were two months overdue for scheduled maintenance of some braking components.

202.  Train 214 was stopped on the track ahead and was partially visible to the operator of Train 112 at a distance of over 1100 feet. If the operator of Train 112 had responded at that point to the presence of Train 214 by activating "the mushroom," an emergency braking system, the train would have braked to a stop before reaching Train 214 and no collision would have occurred.  Instead, the operator of Train 112 did not activate the mushroom until about 300 feet from Train 214.  At the point of activation, Train 112 was traveling approximately 52mph, far too fast to stop in time.

203.  Defendant WMATA, through its agent, servant and employee Jeanice McMillan, who at all times was acting within the scope of her employment, was negligent and careless in the operation of Train 112 and breached its duty to its passengers in the following ways:

a.  Permitting her train to operate at high speed in automatic mode despite approaching a curved section of track nearing a busy station at a busy time of day for train traffic;

b.  Failing to observe and react to the presence of Train 214 despite it being visible more than 1100 feet away, a sufficient distance for activation of the mushroom emergency braking system so as to avoid a collision;

c.     Failing to take reasonable precautions to prevent injury to its passengers and to guard them from injury and death, by among other respects, failing to properly control and maintain Train 112;

d.     And otherwise was negligent, careless and reckless.

204.   Plaintiffs further allege that as a direct and proximate result of the negligence of Defendant WMATA, Train 112, on which the Plaintiffs and decedents previously identified in this pleading were passengers, collided with Train 214 between the Takoma and the Fort Totten Metrorail stations in the District of Columbia on June 22, 2009 at 5:02 p.m. causing serious injuries to the Plaintiffs previously identified in this pleading and causing the deaths of the decedents previously identified in this pleading.

## COUNT IV
### (Negligence – Disabling of Warning Alarms in the Operations Control Center: Defendant WMATA)

205.   The Plaintiffs incorporate by reference paragraphs 1-204 and further allege that at all times mentioned herein, WMATA's trains, railroad operations, tracks and adjoining railroad tracks (hereinafter "the subway property") were owned, controlled, operated, managed, constructed, maintained, repaired, designed, evaluated, built, overseen, patrolled and supervised by WMATA.

206.   Plaintiffs further allege that on June 22, 2009, and prior thereto, Defendant WMATA was responsible for maintaining and ensuring the safe use and proper condition of the railroad operations and property, including locomotives, trains, signs,

signals, switches, safety devices, communication devices and other equipment at and along the subway property, and for properly and safely managing, overseeing and coordinating the travel of railroad trains upon and along said property.

207.   At all times mentioned herein, Defendant WMATA, as a common carrier, owed a duty of reasonable care to the passengers, including the Plaintiffs and decedents previously identified in this pleading.

208.   The movements of trains 214 and 112 were displayed on large screens at WMATA's Operations Control Center.  This display system shows alarms.  The duties of an OCC controller include the monitoring of alarms.  There are alarms for loss of train detection.  Bobbing triggers these alarms.  However, bobbing had become such a frequent occurrence that WMATA deliberately reprogrammed their computer system to automatically erase these alarms.  In other words, WMATA deliberately decided that warnings consistent with loss of train detection were to be automatically dismissed.

209.   WMATA's actions in deliberately disabling alarms showing loss of train detection was reckless.  It is not discretionary to operate trains under automatic control where no warning of loss of train detection requires notification to the operator or controller.

210.   If the warnings were not programmed to be automatically dismissed, thus requiring the OCC controller to act upon them, a controller likely would have communicated with Train 112 and the June 22, 2009 collision likely would have been avoided.

211.    Plaintiffs further allege that as a direct and proximate result of the negligence of Defendant WMATA, Train 112, on which the Plaintiffs and decedents previously identified in this pleading were passengers, collided with Train 214 between the Takoma and the Fort Totten Metrorail stations in the District of Columbia on June 22, 2009 at 5:02 p.m., causing serious injuries to the Plaintiffs previously identified in this pleading and causing the deaths of the decedents previously identified in this pleading.

**COUNT V**
**(Negligence – Failure to Discontinue Usage**
**of Defective and Unsafe Rail Cars:  Defendant WMATA)**

212.    Plaintiffs incorporate by reference paragraphs 1-211 and allege that at all times mentioned herein, Defendant WMATA, as a common carrier, owed a duty of reasonable care to the passengers, including the individual Plaintiffs and decedents previously identified in this Complaint.

213.    Defendant WMATA was on clear and direct notice from the NTSB that the Rohr 1000 series cars were dangerous and unsafe should be removed from the fleet because their "crashworthiness" was inadequate and their propensity to telescope during a collision created an unreasonable and dangerous risk to passengers.  Despite the direct warnings and notices, WMATA did not remove these subway cars from the tracks which was negligent and placed passengers in direct danger.  Since the tragedy, WMATA has placed the 1000 series cars in the middle of the trains.

214. Plaintiffs further allege that as a direct and proximate result of the negligence of Defendant WMATA, Train 112, on which Ana Fernandez was a passenger for hire and riding, collided with Train 214 and telescoped for approximately two-thirds of the length of the car, causing the death of nine individuals on board, and the injuries to the Plaintiffs previously described.

## COUNT VI
### (Negligent Maintenance of Braking Systems: Defendant WMATA)

215. Plaintiffs incorporate paragraphs 1-214 and allege that Defendant WMATA failed to properly maintain its braking system, automatic break-retarding system and other systems designed to prevent the two WMATA trains from colliding.

216. Plaintiffs further allege that Defendant WMATA breached its duty to provide safe transportation for its passengers, including the Plaintiffs and Decedents mentioned previously herein. WMATA may have also failed to maintain Train 112, its various braking and safety systems in ways to be identified through discovery.

217. Before and at the time of the collision, the first two cars of the moving trains were two months overdue for scheduled maintenance of its braking components, which is illustrative of Defendant WMATA's negligence.

218. Plaintiffs further allege that as a direct and proximate result of the negligence of Defendant WMATA, Train 112 was unable to stop in time before violently colliding with Train 214, causing the serious injuries to the Plaintiffs previously identified in this pleading and causing the deaths of the decedents previously identified in this pleading.

**COUNT VII**
**(Negligent Train Traffic Control:**
**Defendants WMATA, Alstom Signaling, Inc., Ansaldo and ARINC)**

219.   Plaintiffs incorporate, by reference, paragraphs 1-218 above, and further allege that at all times relevant herein, Defendants WMATA, Alstom Signaling, Inc., Ansaldo STS USA, Inc., and ARINC owed a duty of reasonable care of providing accurate train traffic control equipment, software and support, in order for all WMATA passengers, including the injured Plaintiffs and Decedents mentioned previously herein, to travel safely.

220.   A track circuit is an electrical circuit that includes a length of running rail and allows the presence of a train to be detected.   The circuit also communicates commands and instructions between the track and the train.  If a train tries to approach too closely to the rear of another train, information provided by the track circuits is used to slow or stop the second train before there is danger of a crash.

221.   Upon information and belief, WMATA's automated trains are controlled by several electronic systems, some or all of which were provided by Defendants Alstom and/or Ansaldo.  The train protection system is made up of circuit embedded along the track, which range from 150 feet to a half-mile long.  As trains cross the circuits, signals are transmitted down the line to following trains.  The signals automatically set speeds, slowing or stopping a train so that it does not crash into the one in front.

222.   The railroad system is divided into blocks, which are varying lengths of track, and computers are set to keep two blocks of distance between trains.  As an added

layer of safety and control, another electronic system regulates train speeds and spacing and stops the trains as they enter stations. A third system controls overall train movements to maintain proper routing and keep trains on schedule and it is monitored by workers in WMATA's downtown central control room.

223. If the train protection and safety system is functioning as designed, when one train begins to enter the two-block buffer behind another, the computers should automatically deploy the brakes on the second train and force it to stop.

224. The Alstom and/or Ansaldo traffic control system showed that it failed to detect the idling train (Train 214), and thus failed to slow or stop the approaching train (Train 112).

225. NTSB investigators performed a simulation on June 24, 2009, in which they positioned a train in the same location where the idling train was rear-ended on June 22, 2009. The system failed to detect that the idled test train was there.

226. After the crash, federal investigators found "anomalies" in a key component of the electronic control system along the WMATA track north of the Fort Totten Metrorail station, suggesting that computer malfunctions were responsible, in whole or in part, for sending Train 112 crashing into Train 214, killing and severely injuring unsuspecting and innocent passengers, including the Plaintiffs and Decedents described previously herein.

227.   The passengers relied on Defendant WMATA and companies, including Defendants Alstom and Ansaldo, to provide safe transportation, which includes safe trains with proper safeguards to prevent collisions.

228.   The findings show that Train 112 did not receive information that Train 214 was stopped ahead on the rails north of the Fort Totten Metrorail station.

229.   When the malfunctioning circuit failed to detect Train 214, the circuit assumed that the stretch of track in front of Train 112 was clear and set the speed of Train 112 at 59 m.p.h. and thereby hurtled Train 112 violently into the rear of Train 214.

230.   By failing to properly maintain its computer safety warning system, system of notice, and/or other safety systems designed to prevent the two WMATA trains from colliding, Defendants WMATA, Alstom and Ansaldo breached their duty to its passengers, including the Plaintiffs and Decedents previously described herein. WMATA may have failed to maintain Train 112 and its various safety systems and computerized prevention systems in other ways to be identified through discovery.

231.   By failing to properly design, install, inspect, test and maintain its computer warning system of notice, and/or other systems designed to prevent the two WMATA trains from colliding, Defendants WMATA, Alstom Signaling, Ansaldo STS, Inc. and ARINC breached their duty to provide accurate and safe train traffic control. Defendants WMATA, Alstom, Ansaldo and ARINC may have failed their above duties regarding their various safety systems and computerized prevention systems used in the WMATA Metrorail system in other ways to be identified through discovery.

232.   As a direct and proximate result of the negligence of the Defendants, Train 112, on which the Plaintiffs and decedents previously identified in this pleading were passengers for hire and riding, collided with Train 214 between the Takoma and the Fort Totten Metrorail stations in the District of Columbia on June 22, 2009 at 5:02 p.m., causing serious injuries to the Plaintiffs previously identified in this pleading and causing the deaths of the decedents previously identified in this pleading.

### COUNT VIII
#### (Negligence –  Failure to Warn: Defendant WMATA)

233.   Plaintiffs incorporate by reference, paragraphs 1-232 above, and further allege that at all times relevant herein, Defendant WMATA had a duty to warn passengers of dangerous conditions that it knew or should have known existed.

234.   In particular, Defendant WMATA had a duty to warn passengers of the dangerous and unsafe condition of the Rohr 1000 series cars, since WMATA was well aware of that these cars were determined to be dangerous in the event of a crash, and WMATA knew that serious harm to passengers was foreseeable, as a result of, inter alia, the propensity of the cars to telescope during a collision.

235.   Defendant WMATA negligently breached its duty by, inter alia, failing to warn passengers of the dangerous and unsafe condition of Rohr 1000 train cars, and placing unknowing passengers in imminent danger of injury and/or death.

236.   In addition, Defendant WMATA had a duty to warn passengers of the dangerous and unsafe condition of its train detection system since WMATA was well aware of repeated failures of the train detection system, knew that it was operating its

trains in automatic mode in reliance on the defective train detection system, knew of at least two near miss incidents due to failures of the train detection system, failed to determine the cause of the Rosslyn near miss incident caused by loss of train detection, had encountered repeated problems with train detection and loss of speed commands following replacement of GRS impedance bonds with US&S impedance bonds, was encountering literally thousands of alarms of loss of train detection at its Operations Control Center, and knowingly disabled the alarms at the OCC by programming the alarms to cancel themselves automatically.

237.    Defendant WMATA negligently breached its duty by, inter alia, failing to warn passengers of the dangerous and unsafe condition presented by the problems with the train detection system, and placing unknowing passengers in imminent danger of injury and/or death.

238.    The dangers and risks described in the preceding two paragraphs were well known to Defendant WMATA but not known to its passengers.  WMATA knew that its un-crashworthy cars and its train detection problems presented risk of catastrophic injury to its passengers but provided no warnings to its passengers.

239.    Instead, WMATA negligently, carelessly and recklessly presented its train system as safe.

240.    As a direct and proximate result of the negligence of Defendant WMATA in failing to warn its passengers of the dangers of the Rohr 1000 train cars, Plaintiffs and Plaintiffs' decedents unknowingly chose to ride on a Rohr 1000 train car, and therefore

were passengers in said train car when it violently collided with Train 214 between the Takoma and Fort Totten Metrorail stations and telescoped for approximately two-thirds of the length of the car, causing the death of nine individuals on board and causing serious injuries serious to the Plaintiffs previously identified in this pleading.

**COUNT IX**
**(Strict Products Liability — Design Defect,**
**Manufacturing Defect, Failure to Warn:  All Defendants)**

241.   Plaintiffs reallege and hereby incorporate, by reference, all of the preceding paragraphs and further allege as follows:

242.   That the Defendants controlled or otherwise participated in the designing, manufacturing, assembling, testing, labeling, distributing, marketing, advertising, selling, warranting and/or placing into the stream of commerce the automatic train control system and/or the automatic train warning system which were utilized by the WMATA subway system on June 22, 2009.

243.   That at all relevant times, the individual Plaintiffs and the decedents previously identified in this pleading, relied upon the fact that the WMATA subway system was safe and appropriate for passenger travel.

244.   That the Defendants and agents thereof had a duty to design, manufacture, assemble, test, label, distribute, market, advertise, sell and/or warrant a product, and in particular the automatic train control system and/or automatic warning system which was not in an unreasonably dangerous condition to members of the public who were intended and/or foreseeable users of the product, and had further a duty to protect such

persons from harm by providing adequate warnings about potential hazards associated with use of said automatic train control system and/or automatic warning system, both at the time of sale and at all times leading up to the June 22, 2009 crash which forms the basis of this Complaint.

245.   That the Defendants breached said duties in that the WMATA automatic train control system and/or automatic warning system was defective in design and/or manufacture at the time it left the Defendants' control such that it malfunctioned in the manner the automatic train control system and/or automatic warning system did on June 22, 2009 as set forth above.

246.   That the defects in the WMATA automatic train control system and/or automatic warning system related to, amongst other things, the failure of the systems to properly and safely control trains to prevent a crash, and the failure of the systems to warn of potential hazards or dangers associated with an impending crash.

247.   That the Defendants further breached their duties by failing to advise, instruct and/or warn consumers and foreseeable users, such as the individual Plaintiffs or the decedents previously identified in this pleading, of the limitations of the automatic train control system and/or automatic train warning system regarding the safety limitations of these systems and/or of the fact that they posed an unreasonably dangerous risk to consumers.

248.   That the individual Plaintiffs and decedents previously identified in this pleading utilized the WMATA subway system in the intended manner, or in the manner

otherwise foreseeable to the Defendants, and at all times the automatic train control system and/or automatic warning system remained in the intended and in the substantially same condition as they were at the time of design, manufacture, distribution and sale by the Defendants.

249.    That the breach of the duties as set forth above, and in particular in the failure to design and manufacture the automatic train control system and the automatic warning system to prevent failures, and the failure to advise and warn of such, caused the automatic train control system and the automatic warning system to be in an unreasonably dangerous condition to the Plaintiffs, decedents and foreseeable users, and created an unreasonable risk of injury and/or death.

250.    As a direct and proximate result of the aforesaid defects, and the related acts and/or omissions of the Defendants and their employees, agents and/or representatives acting in the course and scope of their employment, the individual Plaintiffs and decedents previously identified suffered serious personal injuries and death.

### COUNT X
### (Negligence — Design Defect,
### Manufacturing Defect, Failure to Warn:  All Defendants)

251.    Plaintiffs reallege and hereby incorporate, by reference, all of the preceding paragraphs and further allege as follows:

252.    That the Defendants owed a duty of reasonable care to the individual Plaintiffs and decedents previously identified and foreseeable users of the WMATA

subway system with regard to the design, manufacture, assembly, testing, labeling, distribution, marketing, advertising, sale and warranty of the WMATA subway system, including the automatic train control system and automatic warning control system, and all related products and components.

253.    That the Defendants further owed to the individual Plaintiffs and decedents previously identified and other foreseeable users of the WMATA subway system a duty to warn and/or adequately advise them of any deficiencies associated with the subway system, including the automatic train control system and/or the automatic warning system, and that said duty existed both at the time of sale and at all times leading up to the June 22, 2009 crash which forms the basis of this Complaint

254.    That the Defendants knew or should have known that the aforementioned defect(s) created an unreasonable risk of harm or death to the foreseeable users of the subway system, and should have warned of such.

255.    That the Defendants breached said duties in that WMATA subway system, including the automatic train control system and/or the automatic train warning system was unreasonably dangerous and defective in design and/or manufacture at the time it left the Defendants' control, and the Defendants failed to warn of such or fix such matter.

256.    The defects in the WMATA subway system, including the automatic train control system and/or automatic warning system related to, amongst other things, the failure of the systems to properly and safely control trains to prevent a crash, and the

failure of the systems to warn of potential hazards or dangers associated with an impending crash.

257.   As direct and approximate result of the Defendants' aforesaid negligent acts and/or omissions, the automatic train control system and/or automatic warning system seriously malfunctioned on June 22, 2009 and led to the crash resulting in the injuries and deaths previously described.  .

258.   As a direct and proximate result of the aforesaid defects, and the related acts and/or omissions of the Defendants and their employees, agents and/or representatives acting in the course and scope of their employment, the individual Plaintiffs and decedents previously identified suffered serious personal injuries and death.

**COUNT XI**
**(Breach of Implied Warranty of Merchantability:  All Defendants)**

259.   Plaintiffs reallege and incorporate, by reference, all of the preceding paragraphs and further allege as follows:

260.   That the Defendants had a duty pursuant to an implied warranty of merchantability under District of Columbia Code § 28:2-314, and other similar provisions, whereby Defendants impliedly warranted to the public that their product(s), and in particular automatic train control system and the automatic train warning system was fit for the intended purpose or use for which the products were intended and were made available for sale, namely the safe transit of fare-paying passengers who were the intended users of the WMATA subway system.

261.   That by failing to design, manufacture and/or equip the automatic train control system and/or automatic train warning system with devices that would ensure the proper safe operation of the WMATA subway system, the Defendants breached said implied warranty(ies) and the aforesaid code sections by failing to provide a product free from design and/or manufacturing defects, rendering it unfit for its intended use. The Defendants also failed to warn of such defects and/or problems.

262.   That the individual Plaintiffs and decedents previously identified are in the class of persons who are/were reasonably expected to use, consume, or be affected by the WMATA subway system at issue.

263.   As a direct and proximate result of the aforesaid defects, and the related acts and/or omissions of the Defendants and their employees, agents and/or representatives acting in the course and scope of their employment, the individual Plaintiffs and decedents previously identified suffered serious personal injuries and death.

## COUNT XII
### (Breach of Express Warranty:  All Defendants)

264.   Plaintiffs reallege and incorporate, by reference, all of the preceding paragraphs and further state as follows:

265.   The Defendants and their agents, including retailers, under Section 28:2-313 of the Code of the District of Columbia, expressly warranted via their marketing, advertisements, warranties, sales literature, owners manuals, and other representations that their product(s) and in particular the WMATA subway system, the automatic train

control system, and the automatic train warning system at issue were fit for the purpose for which they were intended, namely the safe transportation of fare-paying and other foreseeable users of the WMATA subway system.

266.    That the Defendants breached said express warranties and the aforesaid code section by failing to provide a product free from design and/or manufacturing defects, rendering it unsafe for its intended use(s), as described in detail above.

267.    As a direct and proximate result of the aforesaid defects, and the related acts and/or omissions of the Defendants and their employees, agents and/or representatives acting in the course and scope of their employment, the individual Plaintiffs and decedents previously identified suffered serious personal injuries and death.

**COUNT XIII**
**(Negligence – Disabling of Warning Alarms in the**
**Operations Control Center: Defendants WMATA and ARINC)**

268.    The Plaintiffs incorporate by reference paragraphs 1-267 and further allege that at all times mentioned herein, WMATA's trains, railroad operations, tracks and adjoining railroad tracks (hereinafter "the subway property") were owned, controlled, operated, managed, constructed, maintained, repaired, designed, evaluated, built, overseen, patrolled and supervised by WMATA.

269.    Plaintiffs further allege that on June 22, 2009, and prior thereto, Defendants WMATA and ARINC were responsible for maintaining and ensuring the safe use and proper condition of the railroad operations and property, including

locomotives, trains, signs, signals switches, safety devices, communication devices and other equipment at and along the subway property, and for properly and safely managing, overseeing and coordinating the travel of railroad trains upon and along said property.

270.    At all times mentioned herein, Defendant WMATA, as a common carrier, owed a duty of reasonable care to the passengers, including the individual Plaintiffs and decedents previously identified in this pleading.

271.    The movements of trains 214 and 112 were displayed on large screens at WMATA's Operations Control Center which ARINC designed and installed.   This display system shows alarms.  The duties of an OCC controller include the monitoring of alarms.  There are alarms for loss of train detection.  Bobbing triggers these alarms. However, bobbing had become such a frequent occurrence that WMATA in coordination with defendant ARINC deliberately reprogrammed their computer system to automatically erase these alarms.  In other words, WMATA and ARINC deliberately decided that warnings consistent with loss of train detection were to be automatically dismissed.

272.    WMATA and ARINC's actions in deliberately disabling alarms showing loss of train detection was reckless.  It is not discretionary to operate trains under automatic control where no warning of loss of train detection requires notification to the operator or controller.

273.   If the warnings were not programmed to be automatically dismissed or if the system had been designed properly to detect trains on the tracks then an OCC controller likely would have communicated with Train 112 and the June 22, 2009 collision likely would have been avoided.

274.   Plaintiffs further allege that as a direct and proximate result of the negligence of Defendants WMATA and ARINC, Train 112, on which the individual Plaintiffs and decedents previously identified were passengers, collided with Train 214 between the Takoma and the Fort Totten Metrorail stations in the District of Columbia on June 22, 2009 at 5:02 p.m., causing serious injuries and deaths previously described.

## COUNT XIV
### (Negligent Train Traffic Control:
### Defendants WMATA, Alstom Signaling, Inc., Ansaldo and ARINC)

275.   Plaintiffs incorporate, by reference, paragraphs 1-274 above, and further allege that at all times relevant herein, Defendants Alstom Signaling, Inc., Ansaldo STS USA, Inc. and ARINC owed a duty of reasonable care of providing accurate train traffic control equipment, software and support, in order for all WMATA passengers, including the injured Plaintiffs and Decedents mentioned previously herein, to travel safely.

276.   A track circuit is an electrical circuit that includes a length of running rail and allows the presence of a train to be detected.   The circuit also communicates commands and instructions between the track and the train.  If a train tries to approach too closely to the rear of another train, information provided by the track circuits is used to slow or stop the second train before there is danger of a crash.

277.    Upon information and belief, WMATA's automated trains are controlled by several electronic systems, some or all of which were provided by Defendants Alstom and/or Ansaldo and/or ARINC, Inc.  The train protection system is made up of circuit embedded along the track, which range from 150 feet to a half-mile long.  As trains cross the circuits, signals are transmitted down the line to following trains.  The signals automatically set speeds, slowing or stopping a train so that it does not crash into the one in front.

278.    The railroad system is divided into blocks, which are varying lengths of track, and computers are set to keep two blocks of distance between trains.  As an added layer of safety and control, another electronic system regulate train speeds and spacing and stops the trains as they enter stations.  A third system controls overall train movements to maintain proper routing and keep trains on schedule and it is monitored by workers in WMATA's OCC.

279.    If the train protection and safety system is functioning as designed, when one train begins to enter the two-block buffer behind another, the computers should automatically deploy the brakes on the second train and force it to stop.

280.    WMATA's traffic control system which was designed and installed by Alstom and/or Ansaldo and/or ARINC, Inc. showed that it failed to detect the idling train (Train 214), and thus failed to slow or stop the approaching train (Train 112).

281.   NTSB investigators performed a simulation on June 24, 2009, in which they positioned a train in the same location where the idling train was rear-ended on June 22, 2009.  The system failed to detect that the idled test train was there.

282.   After the crash, federal investigators found "anomalies" in a key component of the electronic control system along the WMATA track north of the Fort Totten Metrorail station, suggesting that computer malfunctions were responsible, in whole or in part, for sending Train 112 crashing into Train 214, killing and severely injuring unsuspecting and innocent passengers, including the Plaintiffs and Decedents described previously herein.

283.   The passengers relied on Defendant WMATA and Defendants Alstom, Ansaldo and ARINC, to provide safe transportation, which includes safe trains with proper safeguards to prevent collisions.

284.   The findings show that Train 112 did not receive information that Train 214 was stopped ahead on the rails north of the Fort Totten Metrorail station.

285.   When the malfunctioning circuit failed to detect Train 214, the circuit assumed that the stretch of track in front of Train 112 was clear and set the speed of Train 112 at 59 m.p.h. and thereby hurtled Train 112 violently into the rear of Train 214.

286.   By failing to properly maintain its computer safety warning system, system of notice, and/or other safety systems designed to prevent the two WMATA trains from colliding, Defendants WMATA, Alstom, Ansaldo and ARINC, breached their duty to its passengers, including the Plaintiffs and Decedents previously described

herein.  WMATA may have failed to maintain Train 112 and its various safety systems and computerized prevention systems in other ways to be identified through discovery.

287.   By failing to properly design, install, inspect, test and maintain its computer warning system of notice, and/or other systems designed to prevent the two WMATA trains from colliding, Defendants WMATA, Alstom, Ansaldo, and ARINC, breached their duty to provide accurate and safe train traffic control. Defendants WMATA, Alstom, Ansaldo and ARINC may have failed its above duties regarding its various safety systems and computerized prevention systems used in the WMATA Metrorail system in other ways to be identified through discovery.

288.   As a direct and proximate result of the negligence of Defendant WMATA, Alstom, Ansaldo, and ARINC, Train 112, on which the individual Plaintiffs and decedents previously identified were passengers for hire and riding, collided with Train 214 between the Takoma and the Fort Totten Metrorail stations in the District of Columbia on June 22, 2009 at 5:02 p.m., causing the serious injuries and deaths previously described.

## COUNT XV
### (Breach of Warranty & Implied Warranty of Fitness for Particular Purpose:  All Defendants)

289.   Plaintiffs reallege and incorporate, by reference, all of the preceding paragraphs and further allege as follows:

290.    That the Defendants had a duty pursuant to express and implied warranty(ies) of fitness for particular purpose under District of Columbia Code § 28:2-315, and other similar provisions.

291.    That the Defendants had reason to know of the particular needs of the individual Plaintiffs and decedents previously identified because it was specifically foreseeable that fare-paying passengers and other intended users of the WMATA subway system would rely on the system for safe and appropriate travel.

292.    By reason of such knowledge, there was an, or were, implied warranty(ies) that the Defendants, by reason of such knowledge of the particular needs of the individual Plaintiffs and decedents previously identified, there was an implied warranty(ies) that the WMATA subway system was fit for the particular purpose(s) of allowing safe and appropriate passenger travel.  Defendants had reason to know that the individual Plaintiffs and decedents previously identified were relying upon Defendants' superior knowledge, skill and judgment in selecting and operating the WMATA subway system.

293.    That by failing to equip the WMATA subway system, the automatic train control system, and the automatic train warning system with appropriate safety devices that would ensure the proper safe operation of the subway system, Defendants breached these implied warranty(ies) and the previously mentioned code sections by failing to provide a product free from design and/or manufacturing defects, rendering it unsafe for its intended and/or known and/or specified use(s).

294.   That the individual Plaintiffs and decedents previously identified were in the class of persons who are/were reasonably expected to use, consume, or be affected by the WMATA subway system at issue.

295.   As a direct and proximate result of the aforesaid defects, and the related acts and/or omissions of the Defendants and their employees, agents and/or representatives acting in the course and scope of their employment, the individual Plaintiffs and decedents previously identified suffered serious personal injuries and death.

**COUNT XVI**
**(Wrongful Death:  Defendants WMATA,**
**Alstom, Ansaldo STS USA, Inc. and ARINC)**

296.   This claim arises under D.C. Code § 16-2701, *et seq.*, and pertains to all of the claims previously identified which resulted in the death of passengers on the WMATA subway train.

297.   The Plaintiffs incorporate, by reference, paragraphs 1-296 as if fully set forth herein and further allege that as a direct and proximate result of the negligence and the wrongful acts of the Defendants, the next of kin beneficiaries of the decedents, including their spouses and children, as appropriate in their respective claims, incurred funeral and burial expenses, lost a share of the decedents' anticipated future earnings, lost the pecuniary value of services, including the loss of maternal and/or paternal, as appropriate, care, education, training, guidance and advice, expected to be performed by

the decedents, and lost any and all other damages recoverable under the wrongful death statute.

## COUNT XVII
### (Survival Action for Injuries Prior to Death:
### Defendants WMATA, Alstom, Ansaldo STS USA, Inc. and ARINC)

298.   This claim arises under D.C. Code § 12-101, and pertains to all of the claims previously identified which resulted in the death of passengers on the WMATA subway train.

299.   The Plaintiffs incorporate by reference, paragraphs 1-298 as if fully set forth herein and further allege that the decedents' rights of action for injuries prior to their death caused by the negligent conduct of the Defendants survives in favor of the duly-appointed personal representatives of the respective estates as previously described.

300.   The Plaintiffs further allege that as a direct and proximate result of the Defendants' wrongful and negligent conduct, the decedents experienced pre-impact fright, extreme pain and suffering, fear and anticipation of impending injury and death, as well as severe emotional distress and psychic trauma prior to their deaths.

301.   The Plaintiffs further allege that as a direct and proximate result of the Defendants' wrongful and negligent conduct, the decedents' estates lost the probable future earnings and other economic and non-economic damages recoverable under the applicable District of Columbia law.

Pursuant to the Order of the Honorable Reggie L. Walton, United States District Court Judge, the *ad damnum* clauses for the Plaintiffs and decedents previously described are set forth in the attached exhibit.

## JURY DEMAND

The Plaintiffs respectfully request a trial by jury on all issues.

Respectfully submitted,

/s/ Patrick M. Regan
Patrick M. Regan, #336107
Victor E. Long, #323634
REGAN ZAMBRI & LONG, PLLC
1919 M Street, NW, Suite 350
Washington, DC 20036
Ph:  (202) 463-3030
vlong@reganfirm.com
pregan@reganfirm.com
*Counsel for Fernandez  Plaintiffs in*
*Civil Action No. 09-1706*

/s/ Stephen D. Annand
Stephen D. Annand, #480532
David E. Haynes, #483119
THE COCHRAN FIRM
1100 New York Avenue, NW
Suite 340, West Tower
Washington, DC  20005
Ph:  (202) 682-5800
Fx:  (202) 408-8852
sannand@cochranfirm.com
dhaynes@cochranfirm.com
*Attorneys for Plaintiff Carolyn B. Jenkins,*
*Individually and as Personal Representative of the*
*Estate of Veronica DuBose*

- 77 -

/s/ Michael M. Wilson
Michael M. Wilson, #941674
U.S. Court of Appeals
for the District of Columbia #30702
1120 19th Street, N.W. Suite LL-11
Washington, D.C.  20036
Ph:  (202) 223-4488
Fax: (202) 280-1414
wilson@wilsonlaw.com
*Attorney for Plaintiff David Holland*
*and Jason Zimmerman*


/s/ Kim Brooks-Rodney
Kim Brooks-Rodney, #405477
COHEN & COHEN, P.C.
1821 Jefferson Place NW
Washington, DC  20036
Ph:  (202) 955-4529
kbr@cohenandcohen.net
*Attorney for Plaintiffs Wherley & Williams-Lea*


/s/ R. Blake Brunkenhoefer
R. Blake Brunkenhoefer (admitted Pro Hac Vice)
Fed. Bar No. 15559 (S.D. Tex.)
Texas State Bar No. 00783739
Greg W. Turman (admitted Pro Hac Vice)
Fed. Bar No. 16317 (S.D. Tex.)
Texas State Bar No. 00785123
Anna Brunkenhoefer (admitted Pro Hac Vice)
Fed. Bar No. 1064476 (S.D. Tex.)
Texas State Bar No. 24069437
BRUNKENHOEFER, ALMARAZ & TURMAN, PLLC
555 N. Carancahua, Suite 1770
Corpus Christi, Texas 78401-0853
Ph:  (361) 888-6655
bbrunk@gulfattorneys.com
gturman@gulfattorneys.com
abrunk@gulfattorneys.com

/s/ W. Charles Bailey, Jr.
W. Charles Bailey, Jr. (admitted Pro Hac Vice)
District of Maryland Fed. I.D. No. 23580
J. Stephens Simms, D.C. Bar No. 382388
SIMMS SHOWERS, LLP
20 South Charles Street, Suite 702
Baltimore, Maryland 21201
Ph:  (410) 783-5795
wcbailey@simmsshowers.com
jssimms@simmsshowers.com
*Attorneys for Plaintiffs Oscar O. Flores, Individually
and on behalf of the Estate of Ana Graciela Argentina
Fernandez Bautista, dec'd, and on behalf of J.S.F., a
minor child*


/s/ Joseph Cammarata
Joseph Cammarata, #389254
CHAIKIN, SHERMAN,
CAMMARATA & SIEGEL, P.C.
1232 Seventeenth Street, N.W.
Washington, D.C. 20036
joe@dc-law.net


/s/ Ira Sherman
Ira Sherman, #212175
CHAIKIN, SHERMAN,
CAMMARATA & SIEGEL, P.C.
1232 Seventeenth Street, N.W.
Washington, D.C. 20036
sherman@dc-law.net


/s/ Allan M. Siegel
Allan M. Siegel, #447705
CHAIKIN, SHERMAN,
CAMMARATA & SIEGEL, P.C.
1232 Seventeenth Street, N.W.
Washington, D.C. 20036
siegel@dc-law.net
Ph:  (202) 659-8600

*Attorneys for Plaintiffs Kenneth Hawkins
and Andrea Mitchell, as Co-Personal
Representatives of the Estate of Dennis Hawkins*


/s/ Richard A. Bussey
Richard A. Bussey, #249672
STEIN, MITCHELL & MUSE
1100 Connecticut Avenue, N.W., Suite 1100
Washington, D.C.  20036
RBussey@SteinMitchell.com
Ph:  (202) 737-7777
Fax: (202) 296-8312
*Attorney for Michael Moore*


/s/ J. Mitchell Lambros
J. Mitchell Lambros
LAMBROS & LAMBROS
9900 N. York Road
Cockeysville, Maryland  21030
Ph:  (410) 666-2200


/s/ Michael H. Feldman
Michael H. Feldman, #202762
BERMAN, SOBIN, GROSS,
FELDMAN & DARBY, LLP
481 N. Frederick Ave.
Gaithersburg, Maryland 20877
Ph:  (301) 670-7030


/s/ P. Matthew Darby
P. Matthew Darby
BERMAN, SOBIN, GROSS,
FELDMAN & DARBY, LLP
27 West Road, Suite 210
Towson, MD  21204
Ph:  (410) 769-5400
*Attorneys for Plaintiffs Carol Anne Douglas and
Wilcox S. Doolittle, Jr., as Co-Personal*

- 80 -

*Representatives of the Estate of Mary Andress Doolittle*

/s/ Jack H. Olender
Jack H. Olender
JACK H. OLENDER & ASSOCIATES, P.C.
888 17th Street, NW, 4th Floor
Washington, DC  20006
Ph:  (202) 879-7777

/s/ Harlow R. Case
Harlow R. Case
JACK H. OLENDER & ASSOCIATES, P.C.
888 17th Street, NW, 4th Floor
Washington, DC  20006
Ph:  (202) 879-7777

/s/ Sandra H. Robinson
Sandra H. Robinson
JACK H. OLENDER & ASSOCIATES, P.C.
888 17th Street, NW, 4th Floor
Washington, DC  20006
Ph:  (202) 879-7777

/s/ Melissa Rhea
Melissa Rhea
JACK H. OLENDER & ASSOCIATES, P.C.
888 17th Street, NW, 4th Floor
Washington, DC  20006
Ph:  (202) 879-7777
*Attorneys for Plaintiffs Janice Williams and Isaiah Williams, as Co-Personal Representatives of the Estate of Cameron Taihi Williams*

/s/ Lawrence S. Lapidus
Lawrence S. Lapidus, #02922
KARP, FROSH, LAPIDUS,

WIGODSKY & NORWIND, P.A.
1133 Connecticut Avenue, NW
Twelfth Floor
Washington, DC  20036
Ph:  (202) 719-8945
*Attorneys for Plaintiffs Imhotep Yakub and Dawn*
*Flanagan as Parents and Next Friends of D.F.*


/s/ Keith W. Watters
Keith W. Watters, #319210
KEITH WATTERS AND ASSOCIATES
1667 K Street, NW, Suite 677
Washington, DC  20006
Ph:  (202) 887-1990


/s/ Alton C. Hale
Alton C. Hale, Jr., #465001
GARY, WILLIAMS, PARENTI, FINNEY,
LEWIS, MCMANUS, WATSON & SPERANDO
221 East Osceola Street
Stuart, FL  34994
Ph:  (800) 329-4279
*Attorneys for Plaintiffs Imhotep Yakub and Dawn*
*Flanagan as Parents and Next Friends of D.F.*


/s/ James C. Bailey
James C. Bailey, #462391
jcb@becounsel.com
Jason H. Ehrenberg, #469077
jhe@becounsel.com
BAILEY & EHRENBERG, PLLC
1015 18TH Street, NW, Suite 601
Washington, DC  20036
Ph:  (202) 331-1331
Fx:  (202) 318-7071
*Attorneys for Ercilia Molina*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FORT TOTTEN METRORAIL     )
ACCIDENT CASES     )
     )
LEAD CASE:  *Jenkins v. Washington*     )
*Metropolitan Area Transit Authority*     )
*and Alstom Signaling, Inc.*     )
     )
THIS DOCUMENT RELATES TO:     )
ALL CASES     )
_____)

### ATTACHMENT A TO APRIL 1, 2010 MASTER COMPLAINT

Pursuant to the Court's Order at the time of the Status Conference on March 29, 2010, the following are the ad damnum clauses for cases included in the Master Complaint:

### CIVIL ACTION NO. 09-1228

WHEREFORE, the Plaintiff David Holland demands judgment against the Defendant in the amount of Five Hundred Thousand ($500,000.00) in compensatory damages, plus interest and costs, and other appropriate relief.

WHEREFORE, the Plaintiff David Holland demands judgment against the Defendant in the amount of Five Hundred Thousand ($500,000.00) in compensatory damages, plus interest and costs, and other appropriate relief.

Zimmerman:

WHEREFORE, the Plaintiff Jason Zimmerman demands judgment against the Defendant in the amount of Four Hundred Thousand ($400,000.00) in compensatory damages, plus interest and costs, and other appropriate relief.

WHEREFORE, the Plaintiff Jason Zimmerman demands judgment against the Defendant in the amount of Four Hundred Thousand ($400,000.00) in compensatory damages, plus interest and costs, and other appropriate relief.

## <u>CIVIL ACTION NO. 09-1374</u>

WHEREFORE, Plaintiff Clare E. Wherley, as Personal Representative of the Estates of Decedent David F. Wherley Jr. and Decedent Ann C. Wherley, demands judgment on behalf of the next of kin/statutory beneficiaries of Decedent David F. Wherley Jr. and Decedent Ann C. Wherley, Elizabeth W. Regan and David C. Wherley, on the wrongful death claim and requests all damages recoverable under the District of Columbia Wrongful Death Act, jointly and severally from Defendants WMATA and Alstom, and any Defendants added by the Master Complaint based on the counts herein, in an amount to be determined at trial, but believed to be one hundred million dollars ($100,000,000.00), plus costs and interest, and any other and further relief the Court finds appropriate.

WHEREFORE, Plaintiff Clare E. Wherley, as Personal Representative of the Estates of Decedent David F. Wherley Jr. and Decedent Ann C. Wherley, demands judgment on the survival claim for all damages recoverable by the Estates under the District of Columbia Survival Act, jointly and severally from Defendants WMATA and

Alstom, and any Defendants added by the Master Complaint based on the counts herein, in an amount to be determined at trial, but believed to be one hundred million dollars ($100,000,000.00), plus costs and interest, and any other and further relief the Court finds appropriate.

## CIVIL ACTION NO. 09-1514

WHEREFORE, Plaintiff Oscar O. Flores, on behalf of the Estate of Ana Graciela Argentina Fernandez Bautista, Deceased, demands judgment for compensatory damages against all Defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), or such larger amount to be proven at trial, plus costs and interest thereon, and all other relief to which they are justly entitled.

WHEREFORE, Plaintiff Oscar O. Flores, on behalf of his minor child, J.S.F., demands judgment for compensatory damages against all Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00), or such larger amount to be proven at trial, plus costs and interest thereon, and all other relief to which they are justly entitled.

WHEREFORE, Plaintiff Oscar O. Flores, Individually, as the surviving spouse of Ana Graciela Argentina Fernandez Bautista, Deceased, demands judgment for compensatory damages against all Defendants (Washington Metropolitan Area Transit Authority, Alstom Signaling, Inc., Ansaldo STS USA, Inc., and _____, Inc.), jointly and severally, in the full and just amount of Ten Million Dollars

($10,000,000.00), or such larger amount to be proven at trial, plus costs and interest thereon, and all other relief to which he is justly entitled.

## CIVIL ACTION NO. 09-1609

WHEREFORE, the Plaintiffs request an award of compensatory damages against all the Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing in the amount of $25,000,0000.00 (Twenty-Five Million Dollars), or such larger amount to be proven at trial, including interest thereon.

## CIVIL ACTION NO. 09-1706

WHEREFORE, Plaintiff Evelin M. Fernandez, as the duly-appointed Personal Representative of the Estate of Ana Fernandez, requests judgment against the Defendants, jointly and severally, in the full and just amount of Twenty Million Dollars ($20,000,000.00), plus interest and costs.

WHEREFORE, Plaintiff Evelin M. Fernandez, Individually, as the daughter of Ana Fernandez, Deceased, demands judgment against the Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00), plus interest and costs.

WHEREFORE, Plaintiff Antonio Robles Fernandez, Individually, as the son of Ana Fernandez, Deceased, demands judgment against the Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00), plus interest and costs.

WHEREFORE, Plaintiffs Evelin M. Fernandez and Antonio Robles Fernandez, as the Legal Guardians of the minor child, J.L.F. demand judgment against the Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00), plus interest and costs.

WHEREFORE, Plaintiffs Evelin M. Fernandez and Antonio Robles Fernandez, as the Legal Guardians of the minor child, V.E.F. demand judgment against the Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00), plus interest and costs.

WHEREFORE, Plaintiffs Evelin M. Fernandez and Antonio Robles Fernandez, as the Legal Guardians of the minor child, S.V.A. demand judgment against the Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00), plus interest and costs.

WHEREFORE, Plaintiffs Evelin M. Fernandez and Antonio Robles Fernandez, as the Legal Guardians of the minor child, J.S.F. demand judgment against the Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00), plus interest and costs.

## CIVIL ACTION NO. 09-1721

WHEREFORE, Plaintiff Ercilia Molina  requests that the Court enter judgment in her favor and against all of the Defendants, jointly and severally, as follows: (1) compensatory damages in an amount not less than One Million Dollars

($1,000,000.00); (2) pre- and post-judgment interest; (3) costs of the suit, and (4) such other and further relief as this Court may deem just and proper.

## CIVIL ACTION NO. 09-1762

WHEREFORE, Plaintiff Williams-Lea respectfully requests judgment jointly and severally against Defendant WMATA and any Defendants added by the Master Complaint in an amount to be determined at trial but believed to be $1,000,000 in compensatory damages, plus costs of suit, and such other and further relief as this Court deems just and proper.

## CIVIL ACTION NO. 09-1834

WHEREFORE, Plaintiffs Kenneth Hawkins and Andrea Mitchell, as the duly-appointed Co-Personal Representatives of the Estate of Dennis Hawkins, demand judgment of and against Defendants, jointly and severally, in the full amount of Twenty Million Dollars ($20,000,000.00), plus pre-judgment interest and costs.

## CIVIL ACTION NO. 09-1993

WHEREFORE, plaintiff Michael A. Moore demands judgment against the defendants, jointly and severally, in the sum of $750,000.00 and additional sums in accordance with the evidence adduced at trial, plus costs.

## CIVIL ACTION NO. 09-2171

WHEREFORE, Plaintiffs Carol Anne Douglas and Wilcox S. Doolittle, Jr., Co-Representatives of the Estate of Mary Andress Doolittle, request judgment against the

Defendants, WMATA, Alstom and Ansaldo, jointly and severally, in the full and just amount of Twenty-Five Million Dollars ($25,000,000.00), plus interest and costs.

## CASES NOT LISTED

For all cases not listed, this information was not provided by the respective Plaintiffs' counsel prior to the deadline for submitting the Master Complaint. A supplemental attachment will be filed when this information is received.